IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

ROBIN L. WHITE,                          )
                                         )
                    Plaintiff,           )
                                         )
        v.                               )       Case No.
                                         )       13-0438-REL-SSA
CAROLYN W. COLVIN, Acting                )
Commissioner of Social Security,         )
                                         )
                    Defendant.           )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Robin White seeks review of the final decision of the Commissioner of Social

Security denying plaintiff's application for disability benefits under Title II of the Social

Security Act ("the Act") from August 15, 2008, through November 5, 2011. Plaintiff argues

that the ALJ erred in (1) giving little weight to the opinions of plaintiff's treating physician, Dr.

Boulware, and Adult Psychiatric-Mental Health Clinical Nurse Specialist Mary Case, (2)

finding plaintiff not credible, (3) failing to obtain a consultative exam before assessing

plaintiff's residual functional capacity, (4) failing to include physical limitations based on

plaintiff's obesity, and (5) failing to consider plaintiff's need to empty her intestinal reservoir

five to six times per day. I find that the substantial evidence in the record as a whole supports

the ALJ's finding that plaintiff was not disabled from August 15, 2008, through November 5,

2011. Therefore, plaintiff's motion for summary judgment will be denied and the decision of

the Commissioner will be affirmed.

## I.      BACKGROUND

On April 2, 2009, plaintiff applied for disability benefits alleging that she had been

disabled since August 15, 2008. Plaintiff's application was denied initially. On November 19,

2009, a hearing was held before an Administrative Law Judge. On February 4, 2010, the ALJ

found that plaintiff was not disabled. On October 13, 2010, the Appeals Council denied plaintiff's request for review. On September 20, 2011, United States District Judge Nanette Laughrey reversed and remanded for further consideration. On August 13, 2012, a supplemental hearing was held. On August 20, 2012, the ALJ found that plaintiff was disabled as of November 6, 2011, but not before. On March 12, 2013, the Appeals Council denied plaintiff's request for review. Therefore, the second decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).

2

However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.     Is the claimant performing substantial gainful activity?

>       Yes = not disabled.
>       No = go to next step.

2.     Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

>       No = not disabled.
>       Yes = go to next step.

3.     Does the impairment meet or equal a listed impairment in Appendix 1?

>       Yes = disabled.
>       No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

>    No = not disabled.
>    Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

>    Yes = disabled.
>    No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational experts Stella Doring and Carma Mitchell, in addition to documentary evidence admitted at the hearings.

### A. SUMMARY OF TESTIMONY

During the first hearing on November 19, 2009, plaintiff testified; and Stella Doring, a vocational expert, testified at the request of the ALJ.

### 1. Plaintiff's testimony.

At the time of this hearing, plaintiff was divorced and was living in a split-level house with her daughter (Tr. at 37). Plaintiff was 5'8" tall and weighed 262 pounds (Tr. at 37). Plaintiff completed high school and has one semester of nursing classes (Tr. at 37). Plaintiff had a driver's license and was driving every day, taking her daughter to and from work which was 20 miles round trip (Tr. at 37-38). She was able to drive to the doctor and to counseling appointments as well (Tr. at 38). She would see her parents once or twice a week (Tr. at 38).

When asked whether she received food stamps, plaintiff said she did receive them when her daughter's boyfriend lived with them, but since he moved out her daughter makes too much money for them to qualify (Tr. at 39). The ALJ asked plaintiff about requesting speedy disposition of her case due to "dire need" (Tr. at 65). She had submitted an eviction notice dated June 1, 2009, for non-payment of rent, addressed to plaintiff and her daughter, Katie Ellrick (Tr. at 65). Plaintiff's daughter was working at the time (Tr. at 65-66).

4

A.    [S]he's not able to pay the $1,000 rent a month. She gives him her half of the rent.

Q.    Well but she's living there, correct?

A.    Yes.

Q.    Okay. The rent for that house is $1,000 a month?

A.    Yes.

Q.    And she makes $1,918 a month, gross?

A.    Yes.

Q.    Okay. Who, who indicated that you could be evicted?

A.    My landlord, Michael Robbins.

Q.    Okay. How many months have you not paid the rent?

A.    She gives him $500 a month and I have a running tab. I probably owe him about $4,000. He's someone that I've known since middle school and so we're friends and he --

Q.    But you have not been evicted from that -- premises.

A.    No.

Q.    And that's now five months since he first indicated that he was going to evict you.

A.    Yes, we've talked about it.

Q.    Okay well ma'am, I'm going to tell you this and I'm going to tell it to you on the record. I don't appreciate this and the reason I don't and you can take this for what it's worth but there are currently over 8,000 of these cases in this office and we take these critical care/dire need cases very seriously and I was very curious how it was that you filed this request for hearing on June 3 of '09 and got this hearing today and I know now why. But that concerns me greatly.

(Tr. at 66-67).

When asked why she can no longer work, plaintiff testified:

I have such pain in my neck and my back and limited use of my right hand and my mental state is such that I can't concentrate and I just have so much fear and anxiety

5

inside of me that I am afraid to attempt any, the last two jobs I have had I have lost because of my medical condition.

(Tr. at 60).

Plaintiff said her pain is in her lower back, her middle back, her neck and her right leg (Tr. at 67, 68). She rated the pain in her lower back during the hearing was an 8 out of 10, the pain in her middle back was a 5 out of 10, the pain in her neck was an 8 or a 9 out of 10, and the pain in her leg a 6 out of 10 when sitting and a 3 or 4 out of 10 when she stands (Tr. at 67-68). The only medication she has been prescribed for her pain is Meloxicam, a non-steroidal anti-inflammatory (Tr. at 68).

Plaintiff last worked on August 15, 2008, as an accounts payable clerk (Tr. at 39). At that time she had a small bowel obstruction and was hospitalized (Tr. at 39). Plaintiff has had several surgeries including a total colectomy[1] (removal of the colon), a protectomy (removal of the rectum), and hysterectomy (Tr. at 40).

Plaintiff's hysterectomy was performed at Pasadena Hospital in St. Petersburg, Florida (Tr. at 62). When asked why she went so far away for her surgery, plaintiff testified, "Because I have a Barnett continent intestinal reservoir which is a continent ileostomy[2] and there is not a surgeon in Kansas City who will do any sort of a surgery on the abdomen." (Tr. at 62). Plaintiff has an internal pouch and a catheter tube that she empties five or six times a day (Tr.

---

[1]According to plaintiff's Disability Report, her colon was removed in 1989 (Tr. at 211).

[2]According to plaintiff's Disability Report, her Ileostomy was performed in 1989 (Tr. at 211). An ileostomy is an opening in the abdominal wall that is made during surgery. An ileostomy is used to move waste out of the body when the colon or rectum is not working properly. The word "ileostomy" comes from the words "ileum" and "stoma." The ileum is the lowest part of the small intestine. "Stoma" means "opening." The ileum will pass through a stoma after this surgery.

at 62). Plaintiff does not have much of her small intestine left[3] (Tr. at 63). Because of that she is unable to absorb vitamins and has to give herself a Vitamin B12 shot once a month and she takes Vitamin D once a week (Tr. at 63).

Plaintiff had complications following her hysterectomy resulting in kidney failure and she was in the hospital for that in March of 2009 (Tr. at 40). Plaintiff takes medication for her kidneys and has not had further kidney problems since she was released from the hospital (Tr. at 42-43). Plaintiff was diagnosed with gout in March 2009 but the medication she was put on helps that (Tr. at 43).

In August 2008 plaintiff had a nervous breakdown[4] and was hospitalized (Tr. at 43). Plaintiff began seeing Dr. Luther, a psychologist, in June 2009 (Tr. at 44). The lapse in treatment was due to lack of insurance (Tr. at 44). Plaintiff's gynecologist prescribed Lexapro (antidepressant) because she was having problems with her periods and was unable to take hormone replacement because of a history of blood clots (Tr. at 45). Plaintiff thinks her anti-depressant and anti-anxiety medication helps her symptoms, but not always and not fully (Tr. at 46).

---

[3] It is not clear whether this was a mistype or whether plaintiff actually testified that she does not have much of her small intestine left. She has had her large intestine removed; there is no medical evidence that most of her small intestine has ever been removed.

[4] "The term 'nervous breakdown' is sometimes used to describe a stressful situation in which someone becomes temporarily unable to function normally in day-to-day life. It's commonly understood to occur when life's demands become physically and emotionally overwhelming. The term was frequently used in the past to cover a variety of mental disorders, but it's used less often today. Nervous breakdown isn't a medical term, however, nor does it indicate a specific mental illness. . . . Signs of a nervous breakdown vary from person to person and depend on the underlying cause. Exactly what constitutes a nervous breakdown also varies from one culture to another." http://www.mayoclinic.org/diseases-conditions/depression/expert-answers/nervous-breakdown/faq-20057830

Case 4:13-cv-00438-REL   Document 17   Filed 09/22/14   Page 7 of 95

On October 31, 2008, plaintiff missed the last stair while descending a staircase and broke a tarsal bone in the top of her foot (Tr. at 46). Plaintiff was seen at the hospital and was put in a walking boot (Tr. at 46). She did not see an orthopedic surgeon because she did not have insurance (Tr. at 46).

Plaintiff has fractures of two vertebrae in her back, and she has sacroiliitis[5] which causes pain in her tail bone down into her right leg (Tr. at 47). She has bulging discs in her neck and bone spurs on her spine and neck (Tr. at 47). Plaintiff had an x-ray, a CT scan, and an MRI, but Medicaid will not pay for physical therapy (Tr. at 47). She was scheduled to see an orthopedic specialist on February 18, 2010 (Tr. at 47). Plaintiff has had injections in her back which only help for a few days (Tr. at 61).

On July 30, 2009, plaintiff's doctor diagnosed beginning stages of fibromyalgia because "it starts in the back" (Tr. a 48). He prescribed Savella but plaintiff had fits of rage with that medication so she was switched to Lyrica (Tr. at 48). She continues to have fits of rage with that medication (Tr. at 48). When asked to give an example, plaintiff testified that the day before, it was her turn at a three-way stop but another car went when it was plaintiff's turn and she was furious and yelled out the window that it's called a stop sign, and she called the driver a dumb-ass (Tr. at 49).

Plaintiff has difficulty remembering things that have happened a short time ago, such as up to a day or two earlier (Tr. at 55-56). She used to have a very good memory, but after her nervous breakdown she developed memory problems (Tr. at 56). She had hallucinations while she was in the hospital (Tr. at 56). Plaintiff went into the hospital August 15, 2008, and was there for a week (Tr. at 56-57). She initially went to the hospital for a bowel obstruction and

---

[5]Sacroiliitis is an inflammation of one or both of the sacroiliac joints -- the places where the lower spine and pelvis connect.

while there it was discovered that she had an ovarian cyst (Tr. at 57). She was not diagnosed

with any mental problem at that time (Tr. at 57). Plaintiff tried to return to work after her

hospitalization -- for six days the end of October 2008 -- but she was unable to do the job (Tr

at 59). "They had changed my job and I was in such a poor mental state that I was unable to

learn what they wanted me to learn and most days I was very emotional and cried. And I, on

the morning of the 28th I was attempting to go back and I just couldn't. I pulled off the side of

the road and called the human resource manager and told her I wanted to go back to my

home." (Tr. at 59).

Plaintiff has anxiety attacks once or twice a week (Tr. at 60). When asked how long an

anxiety attack lasts, plaintiff testified:

> If I have a doctor's appointment at 3:00 in the afternoon I start pining about it very
> early in the morning about the process of having to get up and get ready and leave my
> house to go to the doctors appointment and generally I get there by the skin of my teeth.
> You know what I mean? I'm there right at 3:00. Because it takes me that long to
> convince myself that I have to go.

(Tr. at 60).

Plaintiff has diabetes but she was taken off her diabetes medication in March 2009 and

at the time of this hearing was taking nothing for that condition (Tr. at 49). She last had her

blood sugar checked several months ago but did not remember the result (Tr. at 49). When

asked if her doctor had put her on any kind of diet or exercise, she said, "Just a diet, just I'm

monitored on my diet." (Tr. at 49). Plaintiff does not always follow her diet (Tr. at 50).

Plaintiff more often has low blood sugar rather than high blood sugar (Tr. at 50).

Plaintiff was first diagnosed with ulcerative colitis in 1977 (Tr. at 50).

Plaintiff gets up around 7:00 a.m. (Tr. at 51). She is able to take care of her own

personal hygiene (Tr. at 51). She does minimal cooking (Tr. at 51). She can load and unload

the dishwasher, but she does not do laundry due to the stairs (Tr. at 51). Plaintiff does not

make beds or clean the bathroom (Tr. at 51).

Plaintiff can walk a block at the most (Tr. at 52). Plaintiff watches television during the day (Tr. at 52). Although she can read, she doesn't (Tr. at 52). She can lift a 12-pack of soda with her left hand but not with her right (Tr. at 52). When asked to describe the most she can lift and carry, plaintiff said she could lift a gallon of milk out of the refrigerator and carry it with both hands to the table (Tr. at 65). She is unable to lift with her right hand because a nerve is "pinched off" in her neck and makes the end of one of her fingers "dead" (Tr. at 53). The bone spurs in her spine caused this years ago (Tr. at 53). Plaintiff had an EMG done 8 years earlier which confirmed this diagnosis (Tr. at 53). Because of her back, plaintiff can only sit for five or six minutes at a time (Tr. at 63). Riding in a car is uncomfortable (Tr. at 63). Slouching back in a chair is her most comfortable position (Tr. at 63). She usually puts her right foot up on her ottoman (Tr. at 64). She cannot elevate her left foot because it is too painful (Tr. at 64). Sitting back in her chair with her right foot up on the ottoman reduces her pain so she stays like that most of the day (Tr. at 64). Plaintiff can stand in one place for five minutes at a time before needing to walk around or sit down (Tr. at 64-65).

Plaintiff is able to squat down to get something off the floor (Tr. at 53-54). If she had to get on the floor to look for something, she could, but she would not be able to get back up (Tr. at 54). She can climb stairs one at a time; she can get on a ladder to change a light bulb if necessary (Tr. at 54). Plaintiff does have problems with balance -- she is unable to stand on only one foot, and the night before the hearing she stumbled getting up from her chair, but she does not know why (Tr. at 54). She has not talked to any doctor about her balance problems (Tr. at 55).

Plaintiff can reach into a cabinet to get a can of soup (Tr. at 55). She can hold a cup of coffee, she can use a pen or pencil but she feels a loss of sensation in her finger the longer she

10

writes (Tr. at 55). Plaintiff drops things when she tries to pick them up in her right hand, can only use her right hand for two or three minutes at a time, and then she has to rest her hand for an hour (Tr. at 62). She has no problems with environmental matters (Tr. at 55).

Plaintiff is not a smoker, she does not drink, and she has never used drugs that were not prescribed to her (Tr. at 58).

## 2. Vocational expert testimony.

Vocational expert Stella Doring testified at the request of the Administrative Law Judge. Plaintiff's past relevant work includes accounts payable clerk, DOT 216.482-010, sedentary, with an SVP of 5; file clerk, DOT 206.367-014, light, with an SVP of 3; and receptionist, DOT 237.367-038, sedentary, with an SVP of 4 (Tr. at 71, 74).

The first hypothetical involved a person who could lift and carry 10 pounds frequently and 20 pounds occasionally; stand and walk for 4 hours per day; sit for 4 hours per day; would need a sit/stand option at will that would not otherwise materially adversely affect his ability to do the job; could push and pull without limitation; could occasionally climb, balance, stoop, kneel, crouch, crawl, finger with the right hand; and could perform work at the SVP 3 level or below (Tr. at 71). The vocational expert testified that such a person could perform plaintiff's past relevant work as a file clerk (Tr. at 71-72).

The second hypothetical was the same as the first except the person would need to elevate his right leg 18 inches off the ground during the day as needed (Tr. at 72). That additional limitation would not affect the person's ability to work as a file clerk (Tr. at 72). The person could also work as a call out operator, DOT 237.367-014, with 310 in Kansas City and 55,000 in the country. It is a sedentary unskilled job with a sit/stand option routinely available (Tr at 72). The person could also work as a surveillance system monitor, DOT 379.367-010, with 400 in Kansas City and 100,000 in the country. This is a sedentary

Case 4:13-cv-00438-REL   Document 17   Filed 09/22/14   Page 11 of 95

unskilled job with a sit/stand option routinely available, and the duties can be performed with one hand (Tr. at 72-73). The person could also work as a hand mounter/photo finisher, DOT 976.684-018, with 120 in Kansas City and 55,000 in the country. This is a sedentary unskilled job requiring only occasional fingering, and a sit/stand option is often available for these jobs (Tr. at 73).

The vocational expert testified that a person who could not work a full 8-hour day or a full 40-hour week or would miss up to 3 days of work per month due to his impairments would not be able to work (Tr. at 73-74).

During the second hearing on August 13, 2012, plaintiff testified; and Carma Mitchell, a vocational expert, testified at the request of the ALJ.

**3.    Plaintiff's testimony.**

Plaintiff's testimony about her condition after November 6, 2011, is not relevant to this case because she has already been found disabled as of that date. However, I have summarized all of her testimony from this hearing.

At the time of this hearing, plaintiff was living in a one-story house with her 85-year-old father (Tr. at 998). Her father had had three stents put in recently due to congestive heart failure (Tr. at 998). Plaintiff lives off her father who makes too much money for them to get food stamps (Tr. at 1005).

Since the last hearing plaintiff's health has gotten worse (Tr. at 999). She had bursitis and a tear in her right shoulder which improved with physical therapy (Tr. at 999). Plaintiff first began having peripheral neuropathy in 2011 (Tr. at 1000). This was caused from a B12 deficiency, which had been caused by the removal of her colon and part of her small intestine (Tr. at 1021). She has numbness from the tips of her toes up to her bladder -- the numbness started in 2010 but the bladder problems just started in the last year (Tr. at 1022).

12

Plaintiff alleges she became disabled on August 15, 2008, because that is the date she went into the hospital for a small bowel obstruction and while she was there she had a nervous breakdown (Tr. at 1000).

Plaintiff had a total colectomy (removal of the colon) with a proctectomy (surgical removal of the rectum) in 1989 which left her with a Brooke ileostomy, which is a bag on the outside (Tr. at 1001). She worked after that surgery (Tr. at 1001). In 1992 she had a procedure which provided an intestinal reservoir -- all of her bag is on the inside and she empties it with a catheter tube five or six times a day, depending on how much she eats and what she eats (Tr. at 1001). It takes anywhere from 5 to 20 minutes to empty it (Tr. at 1024). She worked for years after that procedure was done (Tr. at 1001-1002). She had a total revision in 2003 (Tr. at 1002). Plaintiff was diagnosed with right carpal tunnel syndrome in 2010, which was after the last administrative hearing (Tr. at 1002). Her doctor did not recommend surgery because it was not that bad, but it had been acting up more lately (Tr. at 1002).

Plaintiff entered the hearing room using a walker which she said had been prescribed by Dr. William Boulware sometime in 2011 because plaintiff was falling a lot (Tr. at 1002-1003). Plaintiff experiences excruciating pain in her legs whenever she stands up or walks (Tr. at 1003). She can stand for about five minutes maximum, but she does not get up and down very frequently because it is more painful to get up and down than to just sit (Tr. at 1022). Sitting causes plaintiff to have back pain (Tr. at 1023). While plaintiff was sitting at the hearing, she was experiencing pain in her lower back (described as a 5 out of 10) and the soles of her feet were kind of tingly (Tr. at 1003). She had no other pain (Tr. at 1004). Plaintiff can walk 4 or 5 steps before she experiences pain, and she can walk a block at the most (Tr. at 1023).

Plaintiff takes Oxycodone and OxyContin for her back pain (Tr. at 1020). The pain from her sacroiliitis does not affect how long she can sit or stand -- it is like a stabbing pain but then it is just gone (Tr. at 1020).

Plaintiff weighed 234 pounds, which was 28 pounds less than at the first administrative hearing (Tr. at 1004).

Plaintiff began taking Abilify[6] and Celexa (antidepressant) in November 2010 which help (Tr. at 1006, 1011). Plaintiff hears voices two or three times a week, and they last all day (Tr. at 1006, 1019). Sometime the voices are very cruel and insulting and other times they just want to have a general conversation with her (Tr. at 1006). Plaintiff has been seeing a doctor for this since November 2010 (Tr. at 1007). Although plaintiff was diagnosed with fibromyalgia in November 2010, she has never had any testing done for that condition (Tr. at 1007).

Plaintiff does not help her father around the house, she does no housework at all, she does very little cooking (Tr. at 1012-1013). Plaintiff's father does housework, and plaintiff's daughter comes over and does the laundry and some of the housework (Tr. at 1013). Plaintiff's dad takes care of her dog for her (Tr. at 1013). She sits in her chair, holds her dog, and watches television all day (Tr. at 1013). Plaintiff's daughter does most of the shopping but makes plaintiff go out with her sometimes (Tr. at 1013-1014). Plaintiff goes to Wal-Mart but she has trouble being around people (Tr. at 1014). Although this has been going on for quite some time, plaintiff has never been diagnosed with anything related to this problem (Tr. at 1014). Plaintiff has never had problems with co-workers or supervisors in the past (Tr. at 1015).

---

[6]Treats schizophrenia, bipolar disorder and depression.

14

Plaintiff needs to elevate her feet for about 20 minutes three times a day due to edema (Tr. at 1015). The medication she takes has helped with her edema (Tr. at 1015). Plaintiff can climb stairs if she has to (Tr. at 1015). She has problems with balance -- she can be standing and just lose her balance (Tr. at 1016). Plaintiff cannot squat (Tr. at 1016). She can lift five or six pounds at the most (Tr. at 1016). She could not pick up any more than that due to pain in her back and the fear of dropping it (Tr. at 1016). Plaintiff can get a can of soup out of the cabinet if it is on the bottom shelf (Tr. at 1017). The highest she can reach is about head level (Tr. at 1018). She can hold a cup of coffee with both hands (Tr. at 1018). She can hold a pen or pencil in one hand but her handwriting is not pretty like it used to be (Tr. at 1018). She can write for 4 or 5 minutes at a time and then she needs to rest for 20 minutes (Tr. at 1021).

Plaintiff has trouble with short-term memory (Tr. at 1017). Her doctors think her medication is causing the problem (Tr. at 1017). She has no other adverse medication side effects (Tr. at 1017).

Plaintiff needs to take naps two or three times a week due to fatigue (Tr. at 1025). Each nap is about three hours (Tr. at 1025). She believes her naps may be caused by depression as well (Tr. at 1025). Her depression is still there but it is not debilitating most of the time (Tr. at 1025). About every 2 or 3 months, she stays in bed for up to 3 days due to depression (Tr. at 1025). Being in Wal-Mart, having to be around people she doesn't know or around large crowds cause plaintiff anxiety (Tr. at 1025). She has an anxiety attack a couple times a month (Tr. at 1025). Her anxiety attacks last about 15 minutes -- she usually just goes to the fabric department where there are fewer people and waits for it to pass (Tr. at 1026).

Before plaintiff was committed, her anger led her to be homicidal (Tr. at 1027). She has not had anger problems for at least a year (Tr. at 1027).

### 4. Vocational expert testimony.

Vocational expert Carma Mitchell testified at the request of the ALJ. Plaintiff has transferrable skills from her past relevant work but only to jobs with an SVP of 3, 4 or 5 (Tr. at 1029).

The first hypothetical involved a person between the ages of 46 and 50 with a high school education who could lift and carry up to 10 pounds, stand and walk 2 hours per day, sit for 6 hours per day, with an unlimited ability to push and pull, and would need a sit/stand option at will without materially adversely affecting his ability to do the job. The person could not use ladders, scaffolding or ropes, could not crouch, crawl or kneel. The person could occasionally climb stairs, balance and stoop. The person could frequently, but not continually, handle and finger with his right upper extremity. The person is limited to simple, unskilled work at SVP 2 or less (Tr. at 1030). The vocational expert testified that such a person could not perform any of plaintiff's past relevant work (Tr. at 1030). The person could do unskilled sedentary work as a document preparer, DOT 249.587-018, sedentary unskilled with an SVP of 2. There are 500 such positions in Missouri and more than 32,000 in the country. The person could work as an addresser, DOT 209.587-010, sedentary unskilled with an SVP of 2. There are 300 positions in Missouri and over 23,000 in the country. The person could work as an order clerk, DOT 209.567-014, sedentary unskilled with an SVP of 2. There are 450 such positions in Missouri and 17,000 in the country (Tr. at 1030-1031).

The second hypothetical was the same as the first except the person would need to have limited contact with the general public (Tr. at 1031). The vocational expert testified that such a person could still work as an addresser and document preparer (Tr. at 1031).

The third hypothetical was the same as the first except the person would need the ability to elevate his foot periodically through the day as high as 18 inches (Tr. at 1032). The

16

vocational expert testified that such a person could still work as an addresser or document preparer (Tr. at 1032).

The fourth hypothetical was the same as the third except the person would be unable to work a full 8-hour day or a full 40-hour week (Tr. at 1032). Such a person could not work (Tr. at 1033).

The fifth hypothetical incorporated the Mental Residual Functional Capacity Assessment completed by Mary Chance, APRN, on April 22, 2012 (Tr. at 1034, 2506-2507). The vocational expert testified:

> Well, typically what has been my experience was that if a person would have moderate limitations in those types of area, you know, there are more methods of borderline of being able to sustain work, you know, on a competitive basis. You know, if all the moderates were occurring, you know, if all the problems where the moderate limitations were occurring at the same time, I would expect the person would have difficulty sustaining work. But it would depend on -- it was difficult to answer that question.
>
> I would say typically, with that type of profile, they would be on the edge of being able to sustain work, but it has been my experience that with employers, if it does kind of compile, like if they're having difficulty interacting, you know, and accepting criticism and, you know, performing tasks, you know, it just combines to the effect where it's too much and they aren't able to sustain the job.

(Tr. at 1034).

An acceptable absentee rate is one to two days per month, but typically two days every month is unacceptable (Tr. at 1033). If a person needed unscheduled breaks 5 to 6 times per day for 5 to 20 minutes at a time, the person could not work (Tr. at 1033). If the person were off task 20% of the day, he could not work (Tr. at 1033-1034).

**B.    *ADMINISTRATIVE REPORTS***

The record contains the following administrative reports:

**Earnings Record**

The record shows that plaintiff earned the following income from 1979 through 2009:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1979 | $ 1,642.80 | 1995 | $ 5,044.61 |
| 1980 | 3,055.50 | 1996 | 0.00 |
| 1981 | 3,684.87 | 1997 | 9,236.03 |
| 1982 | 4,405.30 | 1998 | 17,716.52 |
| 1983 | 2,430.77 | 1999 | 19,775.15 |
| 1984 | 8,863.92 | 2000 | 25,654.83 |
| 1985 | 10,901.04 | 2001 | 24,796.13 |
| 1986 | 6,900.84 | 2002 | 23,041.48 |
| 1987 | 4,339.25 | 2003 | 26,142.83 |
| 1988 | 2,591.83 | 2004 | 32,285.20 |
| 1989 | 9,171.69 | 2005 | 28,012.77 |
| 1990 | 0.00 | 2006 | 29,046.31 |
| 1991 | 897.36 | 2007 | 30,521.51 |
| 1992 | 0.00 | 2008 | 23,492.36 |
| 1993 | 12,566.43 | 2009 | 848.40 |
| 1994 | 15,585.86 | 2010 | 1,680.64 |

(Tr. at 154, 1170).

Plaintiff had no earnings in 2011 or 2012 (Tr. at 1170). The earnings listed for 2009 and 2010 were not from employment, they were from plaintiff's insurance company (Tr. at 1176).

**Function Report**

In a Function Report dated January 6, 2009, plaintiff reported that she takes care of her elderly parents, ages 79 and 81 (195-202). She feeds and waters her dog and cat. Plaintiff has

18

no difficulty with any form of personal care. She does not need reminders to take medicine or perform personal needs. She prepares her own meals. Despite reporting that she prepares her own meals, where the form asked to explain why the claimant cannot prepare meals, plaintiff wrote, "I am tired of fighting and I just don't have the desire to do anything. I hate to leave my home." Plaintiff loads and unloads the dishwasher. She did not do laundry because at the time her foot was broken because she could not navigate the stairs. Plaintiff is able to go out alone and she can drive. She has no problems getting along with others but has never been very social. Her impairments affect her ability to lift, walk, talk, climb stairs, complete tasks and concentrate. Her impairments do not affect her ability to squat, bend, stand, reach, sit, kneel, hear, see, remember, understand, follow instructions, use her hands or get along with others. She can walk a mile before needing to rest for 5 minutes. She can pay attention "as long as needed". She follows written and spoken instructions "very well."

**Report of Contact**

On April 28, 2009, Lindsey Struemph, DDS, telephoned plaintiff to get more information in connection with her application for disability benefits (Tr. at 232-233). On this day, plaintiff said she was "doing laundry and going up and down stairs. . . . She still cares for her parents and her mother is having her 17th radiation treatment for esophageal cancer." Plaintiff was able to do laundry, do dishes, and make sandwiches and breakfast. Plaintiff stated that she was able to do more now that her antibiotic had been discontinued. She said she was taken off Cymbalta due to being on an antibiotic and so going outside was "challenging" although plaintiff was able to drive. At the time plaintiff was taking only Klonopin[7] and

---

[7]Klonopin, also called Clonazepam, is a schedule IV controlled substance used to treat panic disorder and bipolar disorder.

Allopurinol.[8] "The claimant. . . can manage her finances if she has any. The claimant then laughed after making this statement."

Plaintiff said she had problems lifting and walking. She said she had mood swings due to her hysterectomy. She was able to climb stairs slowly. She had problems completing tasks and concentrating due to depression and anxiety. Plaintiff said she was no longer able to walk a mile.

### Function Report

In a Function Report dated May 26, 2009, plaintiff indicated that she takes her daughter to work and picks her up every day, she cleans the kitchen, loads and unloads the dishwasher, rarely goes outside but when she does she can go out alone and she drives, is able to shop in stores for groceries once a week for a half an hour (Tr. at 241-248). Her impairments affect her ability to lift, squat, bend, stand, walk, climb stairs, complete tasks, and concentrate. Her impairments do not affect her ability to sit, kneel, reach, remember, understand, follow instructions, use her hands or get along with others. She can pay attention "a long as it takes." She follows written and spoken instructions "very well." Plaintiff's diabetes is controlled with diet. Her left foot did not heal correctly causing pain and swelling.

### Notice to Quit and Deliver

Michael Robbins prepared a notarized notice to quit and deliver dated May 29, 2009, stated that plaintiff and Katie Ellrick were to deliver possession of their residence on June 1, 2009, due to non-payment of rent (Tr. at 97).

### Activities of Daily Living

On September 12, 2009, plaintiff completed an Activities of Daily Living questionnaire in which she reported that she had lived at her current address for three years (Tr. at 273).

---

[8]Allopurinol treats gout and kidney stones by lowering the amount of uric acid in blood.

20

When asked "Do you plan to move in the near future?" plaintiff responded, "No" despite having received an eviction notice about three months earlier which she used to expedite her disability case under the "dire need" provision.

## Application for Disability Benefits

On April 4, 2011, plaintiff filed another application for disability benefits in which she stated that she had not previously filed an application for benefits (Tr. at 1182-1190).

## Disability Report

In a Disability Report plaintiff was asked to list all of the physical and mental conditions which limit her ability to work (Tr. at 1212). She included the following: Neuropathy, fibromyalgia, diabetes, Barnett Continent Intestinal Reservoir, gout, hysterectomy, nervous breakdown, back pain, chronic all over body pain, anger issues & outbursts, antisocial behavior, anxiety, neck pain, chronic fatigue, difficulty ambulating, homicidal & suicidal thoughts, lack of focus & concentration, leg cramping, weakness & pain, memory problems, multiple personalities, panic attacks, muscle & arm pains, paranoia, renal dysfunction & failure, kidney issues, risky & dangerous behavior, anemia, sinus polyps, nosebleeds, muscle spasms, vertigo, bladder incontinence, and balancing issues.

## Function Report - Third Party

Plaintiff's daughter completed a Function Report on May 15, 2011 (Tr. at 1228-1235). "Due to her recent fall and breaking her rib she is unable to do much of anything." Plaintiff has no trouble with personal care including dressing and bathing. She prepares her own meals daily but they are simple. Plaintiff is able to drive, she is able to shop in stores for groceries once a week for less than an hour. All of the abilities listed on the form were marked as impacted by plaintiff's condition except understanding, following instructions, talking, hearing and seeing. Plaintiff starts what she finishes. She follows written instructions well.

21

**Function Report**

Plaintiff completed another Function Report on May 15, 2011, the same day her daughter completed one (Tr. at 1240-1248). Plaintiff is able to help sort and fold clothes, but her father does the heavy lifting. Plaintiff goes out once or twice a week depending on the weather. She drives sometimes. She is able to shop in stores for groceries. Plaintiff's condition affects every ability listed on the form except understanding, getting along with others, hearing, seeing and talking. She can follow written instructions "pretty well." Plaintiff used to go to church before her mother passed away.

## C.   *SUMMARY OF MEDICAL RECORDS*

On August 11, 2008, plaintiff saw William Boulware, M.D., and complained of gynecological problems (Tr. at 419, 424). Plaintiff was having "terrible mood swings, irritability, hot flashes". Her physical exam was normal. Dr. Boulware increased plaintiff's Lexapro (antidepressant) and started her on Xanax.[9]

August 15, 2008, is plaintiff's alleged onset of disability.

From August 15, 2008, through August 22, 2008, plaintiff was hospitalized at North Kansas City Hospital (Tr. at 294-338, 358-359, 396-399, 434-439, 441, 668-671). Plaintiff was admitted with what was thought to be a partial small bowel obstruction with a history of

---

[9]Xanax, also called Clonazepam and Alprazolam, is a schedule IV controlled substance used to treat anxiety.

ulcerative colitis,[10] status post proctocolectomy[11] with a Barnett continent ileostomy. An NG tube[12] was inserted due to plaintiff's complaints of pain and nausea. Scans confirmed partial small bowel obstruction "presumed from adhesions from previous intra-abdominal infections." Plaintiff's symptoms resolved without surgical intervention (Tr. at 307). Her nausea subsided by August 20, 2008, and she was progressed to solid foods without difficulty. She was discharged with prescriptions for Alprazolam, Vicodin (opioid pain reliever) as needed for pain with one refill, and an antibiotic for a urinary tract infection. Plaintiff's records indicate she was on the same dose of Alprazolam when she was admitted, and therefore her anti-anxiety medication did not change due to this hospitalization.

Plaintiff testified that she suffered a nervous breakdown during this hospitalization. She was noted to have experienced "generalized anxiety" due to heavy menstrual periods (Tr.

---

[10]Ulcerative colitis is an inflammatory bowel disease that causes long-lasting inflammation and ulcers (sores) in the digestive tract. Ulcerative colitis affects the innermost lining of the large intestine (colon) and rectum.

[11]Total proctocolectomy with ileostomy is surgery to remove all of the colon (large intestine) and rectum.



[12]Gastric intubation via the nasal passage (ie, nasogastric route) is a common procedure that provides access to the stomach for diagnostic and therapeutic purposes. A nasogastric (NG) tube is used for the procedure. NG tubes may be used for feeding or for drainage.

Case 4:13-cv-00438-REL   Document 17   Filed 09/22/14   Page 23 of 95

at 298). She was described as pleasant by Gregory Mulcahy, M.D. (Tr. at 306). She was observed to be resting comfortably in no acute distress by Brian Wittek, M.D. (Tr. at 308). On August 16, 2008, plaintiff underwent a limited small bowel follow through.[13] During this exam she was in a supine position while a contrast medium was inserted through her nasogastric tube causing gastroesophageal reflux. Plaintiff had a panic attack during this test and it was completed with her in a standing position rather than lying supine (Tr. at 319). At the conclusion of that test plaintiff was in stable condition, and there is no indication that anti-anxiety medication was required. There is no other mention of anxiety or any other mental symptoms or complaints anywhere in the records of this 8-day hospitalization.

On August 29, 2008, plaintiff saw Dr. Boulware for a follow up after discharge from the hospital (Tr. at 421-422). Plaintiff said she felt horrible, she had no energy, no strength, wears out easily. Dr. Boulware noted that plaintiff's type II diabetes was stable. Her urinary tract infection had resolved. He filled out plaintiff's paperwork to take FMLA time off work until after a gynecological procedure scheduled for early September and ordered lab work.

On September 4, 2008, plaintiff underwent a hysteroscopy,[14] D&C,[15] and Thermachoice

---

[13]A small bowel follow-through, also called small bowel series, is a radiologic examination of the small intestine. Normally, the study is done while the patient is drinking a contrast medium. The contrast dye appears white on X-rays and shows the outline of the internal lining of the small bowel. An X-ray is taken every 30 minutes tracking the progression of the contrast dye. It is necessary for the patient to drink 1 cup of contrast medium after each X-ray until it has progressed through the small bowel. Because plaintiff had a nasogastric tube, she was laid on a table elevated greater than 60 degrees "to decrease aspiration risk". The contrast medium was slowly injected through plaintiff's nasogastric tube. "A moderate degree of gastroesophageal reflex was identified, immediately after which the gastrografin [contrast medium] injection was immediately stopped." Once the reflux resolved, the test was continued. Eventually abdominal radiographs were obtained of plaintiff while in a standing position "since the patient was not able to tolerate supine position due to a panic attack and difficulty breathing." (Tr. at 319).

[14]A hysteroscopy is a procedure that allows a doctor to look inside the patient's uterus in order to diagnose and treat causes of abnormal bleeding. Hysteroscopy is done using a hysteroscope, a thin, lighted tube that is inserted into the vagina to examine the cervix and

24

endometrial ablation[16] at Liberty Hospital (Tr. at 350, 356-357, 360-362). "The procedure was technically challenging because of Robin's morbid obesity and extreme anteversion of her uterus." Plaintiff tolerated the procedure well.

On September 25, 2008, plaintiff saw Dr. Boulware (Tr. at 416-417). "Wants to talk about anxiety - takes Xanax and Lexapro. Doing the same job x 9 years - changed to Coventry Insurance - they have been nothing but trouble - hasn't received a check yet, 'drowning', Katie [plaintiff's daughter] is the only one working, they have given her job to someone else - she'll have to work a different job. (wants to go on disability because she's going out of her mind.)" Plaintiff's exam was normal. Dr. Boulware told her to discontinue Xanax and he prescribed Klonopin (mood stabilizer) and Cymbalta (treats major depressive disorder, anxiety, and fibromyalgia).

On October 15, 2008, plaintiff saw Jennifer Salmons, LPC, and reported "recent problems & symptoms of depression and anxiety." (Tr. at 364, 689-693, 701-704). Plaintiff reported that her parents' health was failing and plaintiff was helping to care for them. Plaintiff was on medical leave from work at the time. "Cl struggling financially - going on disability or FLMA [sic]." Plaintiff reported some thoughts of suicide but "couldn't b/c parents & daughter - not seriously." She reported no homicidal ideation. Ms. Salmons performed a mental status exam and noted that plaintiff was well-groomed and cooperative, but agitated and depressed. Her thought process was intact, she had no hallucinations, no delusions. She

inside of the uterus.

[15]Dilation and curettage (D&C) is a procedure to remove tissue from inside the uterus. Doctors perform dilation and curettage to diagnose and treat certain uterine conditions -- such as heavy bleeding.

[16]Thermachoice endometrial ablation reduces heavy bleeding by removing most, if not all of the lining of the uterus.

Case 4:13-cv-00438-REL   Document 17   Filed 09/22/14   Page 25 of 95

was fully oriented, her memory was intact, her judgment and insight were minimally impaired. She assessed mood disorder not otherwise specified with a GAF of 65.[17]

On October 16, 2008, plaintiff saw Dr. Boulware (Tr. at 414-415). Plaintiff needed a release to return to work on October 20, 2008. Plaintiff reported that she had seen a counselor, that she was doing well on her increased dose of Klonopin, that emotionally she was feeling better, that her stress seemed more controlled. She was assessed with major depression much better compensated and generalized anxiety disorder better compensated. He gave her a flu vaccination and refilled her medications. "Wrote a release to return to work without restrictions."

On October 27, 2008, plaintiff saw Jennifer Salmons, LPC (Tr. at 364, 693). No specific allegations of mental symptoms were noted; no mention of a recent nervous breakdown was noted.

On October 31, 2008, plaintiff went to Liberty Hospital complaining of left ankle redness, swelling and warmth (Tr. at 367-384, 430-431). Plaintiff was at a friend's house and missed the last stair, tripping. X-rays were taken which showed a possible small avulsion fracture. X-rays showed only mild degenerative changes about the knee with no acute bony abnormality. Plaintiff was given an aircast splint and an Ace wrap and was discharged.

On November 4, 2008, plaintiff saw Dr. Boulware for a follow up on her "left ankle sprain and generalized anxiety disorder with major depression" (Tr. at 410-411). The record indicates that plaintiff had gone to Liberty Emergency Room a few days earlier and it was determined that she did not have an ankle fracture. "Having problems @ work so went back

---

[17]A global assessment of functioning of 61 to 70 means some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

on FMLA. They are wanting her to learn a different job." He refilled her Vicodin, told her to keep her left ankle elevated with ice, "walk with a walker, cane or crutches", and slow rehabilitation instructions were given. "Continue off work for both acute physical and psychiatric problems." Dr. Boulware did not observe any psychiatric problems, he did not list any complaints of psychiatric problems, he did not diagnose any specific psychiatric problems.

On November 14, 2008, plaintiff saw Jennifer Salmons, LPC (Tr. at 675, 683). Plaintiff reported feeling overwhelmed, and coping skills were discussed.

On November 21, 2008, plaintiff saw Dr. Boulware to follow up on x-rays that had been taken at Liberty Hospital ten days earlier (Tr. at 409, 423-433, 612-619). She indicated that her ankle was still very painful. No treatment is listed.

In early December 2008, plaintiff requested additional refills of her Vicodin (opioid pain medication) (Tr. at 408). Dr. Boulware instructed his staff to find out how many plaintiff was taking; she said at least 6 a day, mainly 7 or 8 per day. Her prescription had limited her to no more than 6 per day. Dr. Boulware indicated that plaintiff was using too much pain medication and he said plaintiff would need to be seen that week.

On December 12, 2008, plaintiff saw Dr. Boulware for a recheck on foot pain (Tr. at 404-407). "Need to discuss Vicodin use." Dr. Boulware completed paperwork for plaintiff's long term disability claim with Sun Life Assurance Company. In this form Dr. Boulware indicated that in a normal day plaintiff could stand and walk for 1 to 4 hours secondary to her fractured ankle; she could sit for 5 to 10 hours; she could drive for 5 to 10 hours; she could do simple and firm grasping with both hands; she could perform fine manipulation with both hands; she could bend 67 to 100% of the time; she could climb 34 to 66% of the time; she could twist her body, push, pull, grasp or reach 67 to 100% of the time; she could crawl up to 33% of the time; and she could never squat, balance (due to fracture in ankle) or kneel. "Can

27

employee work an 8 hour day with the above restrictions?" Dr. Boulware answered, "yes." He concluded with, "Pt can work if environment not severely stressful." No other mention of "psychiatric problems" appear in this form, despite Dr. Boulware's notation on November 4, 2008, that plaintiff at that time should "continue off work for both acute physical and psychiatric problems." Therefore, one can assume that whatever psychiatric problems were keeping plaintiff from working less than two months earlier had resolved by this day.

On December 22, 2008, plaintiff saw Jennifer Salmons, LPC (Tr. at 675, 683). Plaintiff discussed financial difficulties and feeling overwhelmed with the holidays.

On December 29, 2008, plaintiff saw Dr. Boulware complaining of continued pain in her left ankle (Tr. at 401-403, 833-834). Dr. Boulware questioned whether a piece of evulsed bone was causing intermittent pain with various positions of the ankle. He told plaintiff to remain in the walking boot for an additional two weeks, do range of motion exercises frequently, and "begin to limit her Vicodin usage as her fracture should be improving at this point in time." He referred plaintiff to an orthopedic specialist. "Filled out a disability paper in depth with patient's assistance."

On January 7, 2009, plaintiff saw Jennifer Salmons, LPC (Tr. at 675, 677). This would be her last appointment until June 10, 2009, five months later. During this visit, plaintiff discussed the problems associated with going from short term disability to long term disability.

On January 23, 2009, plaintiff was seen in the emergency room at North Kansas City Hospital due to complaints of abdominal pain (Tr. at 774-791, 875-876). On exam no edema was observed in her extremities. Her back was normal. She had normal range of motion and no tenderness in her extremities. Her psychological exam was normal. She had an abdominal CT scan which showed no evidence of mechanical bowel obstruction, and stable post-surgical changes of partial colonic resection and right lower quadrant ileostomy (Tr. at 541-542, 593).

She was given IV Dilaudid (opioid pain reliever) and assessed with pelvic pain, unknown cause.

On January 26, 2009, Keith Allen, Ph.D., completed a Psychiatric Review Technique (Tr. at 456-467). He found that plaintiff suffers from depression and anxiety resulting in no restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation. In support of his findings, Dr. Allen noted that plaintiff claimed she was terminated on November 18, 2008, while she was still on short term disability and had not been released by her doctor to return to work. However, plaintiff's doctor had released her to return to work without restrictions in October 2008. He also noted the following sequence with regard to plaintiff's mental health treatment:

> 5/11/08 having terrible mood swings, irritability, crying, was prescribed Lexapro and Xanax. 8/11/08 generalized anxiety noted. 8/29/08 no psych complaints noted. 9/9/08 no psych complaints. 9/25/08 major depressive disorder not well compensated, generalized anxiety disorder not well compensated. Xanax was stopped and Klonopin and Cymbalta were started. Plaintiff wanted to go on disability because of being expected to do a different job. 10/16/08 major depression much better compensated, generalized anxiety disorder better compensated, released to return to work with no restrictions, doing well on Klonopin. 11/4/08 continue off work due to acute physical and psychiatric problems. 12/12/08 increased stress/anxiety. 12/29/08 no mention of mental health issues. North Kansas City Hospital in August 2008 makes no psychiatric diagnosis on discharge.

Dr. Allen noted plaintiff's daily activities which included taking care of her elderly parents and her pets, she did not need reminders regarding self care or taking medication, she prepared her own breakfast daily, took care of loading and unloading the dishwasher, was able to get out alone, drove without reported difficulty, was able to manage her own funds, did not need to be reminded to go places and did not need to be accompanied, reported no problems getting along with family/friends/neighbors/others and reported being able to follow written and spoken instructions very well.

29

That same day Dr. Allen completed a Mental Residual Functional Capacity Assessment (Tr. at 468-470). Dr. Allen found that plaintiff was not significantly limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to understand and remember detailed instructions

- The ability to carry out very short and simple instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to ask simple questions or request assistance

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

He found that plaintiff was moderately limited in the following:

30

- The ability to carry out detailed instructions

- The ability to interact appropriately with the general public

On February 6, 2009, plaintiff saw Dr. Boulware regarding an abnormal pelvic sonogram (Tr. at 584-586, 771-772, 831-832). Dr. Boulware contacted Dr. Ernest Rehnke about performing a hysterectomy.

From March 6, 2009, through March 13, 2009, plaintiff was hospitalized for excessive menstruation at Palms of Pasadena in St. Petersburg, Florida (Tr. at 479-501, 518-532, 621-627, 632-654). During a review of systems, plaintiff denied back pain (Tr. at 481, 532, 633). She denied fatigue, reported being active, denied pain and edema, she denied shortness of breath, she denied arthritis, she denied gout, she denied difficulty walking, she denied joint pain (Tr at 481, 532, 633). She had a total hysterectomy performed by Dr. Rehnke who had earlier performed an intestinal surgery and agreed to perform this surgery. She was discharged on a diabetic diet and with a prescription for Darvocet, an opioid pain reliever.

Five days after her release from the hospital in Florida, plaintiff was admitted to North Kansas City Hospital where she was a patient until her release on March 25, 2009 (Tr. at 503-516, 575-582, 657-667, 726-769, 867-870, 877-880, 915-918, 933-937). After her release in Florida, plaintiff had experienced increased nausea and vomiting, and upon arrival at North Kansas City Hospital was severely dehydrated and in acute renal failure. She had E. coli[18]

---

[18]"Escherichia coli (E. coli) bacteria normally live in the intestines of healthy people and animals. Most varieties of E. coli are harmless or cause relatively brief diarrhea. But a few particularly nasty strains, such as E. coli O157:H7, can cause severe abdominal cramps, bloody diarrhea and vomiting. You may be exposed to E. coli from contaminated water or food -- especially raw vegetables and undercooked ground beef. Healthy adults usually recover from infection with E. coli O157:H7 within a week, but young children and older adults have a greater risk of developing a life-threatening form of kidney failure called hemolytic uremic syndrome."
http://www.mayoclinic.org/diseases-conditions/e-coli/basics/definition/con-20032105

Case 4:13-cv-00438-REL   Document 17   Filed 09/22/14   Page 31 of 95

growing from her urine with sepsis syndrome.[19]  Tests revealed a probable abscess (later

determined to be a presacral gas collection) in the area of her hysterectomy which was

draining spontaneously.  Plaintiff was put on IV antibiotics, pain medication and hydration and

improved rapidly.  Plaintiff's records show that she did not report any mental health issues in

her past medical history (Tr. at 509, 739).  "She is presently out of work, but looking for a job.

She has been unable to hold down a job on a regular basis secondary to her severe illness." (Tr.

at 739).  On exam throughout her hospital stay, no edema was observed in her extremities (Tr.

at 509, 740, 752).  Mary O'Connor, M.D., noted, "I am not entirely clear if she is really septic

or just profoundly dehydrated." (Tr. at 510, 744).  Per Infectious Disease, a PICC line[20] was put

in place so that plaintiff could continue to receive IV antibiotics on an outpatient basis.  Upon

discharge plaintiff was restricted to an 1,800 calorie per day diet with no more than 4 grams

of sodium.  Plaintiff was scheduled for an outpatient CT scan of the abdomen in one week

along with a follow up with Infectious Disease.

On March 26, 2009, plaintiff was visited at home by Critical Care Systems to initiate

her IV antibiotics (Tr. at 885-886, 905).  "She reported a severe reaction to Phenergan in the

hospital that caused 'seizure like convulsions'.  Now has compazine for nausea.  Pt lives in split

entry house which is rather unkempt, cluttered with clothes on floor, cat and dog in house

with much animal hair on furniture.  The dog is quite protective and frequently nipping,

trying to bite me while caring for the patient.  Daughter's fiancé somewhat helpful in

---

[19]To be diagnosed with sepsis, you must exhibit at least two of the following symptoms:
• Body temperature above 101 F (38.3 C) or below 96.8 F (36 C)
• Heart rate higher than 90 beats a minute
• Respiratory rate higher than 20 breaths a minute
• Probable or confirmed infection

[20]A peripherally inserted central catheter or "PICC" is a thin, soft, flexible tube -- an
intravenous (IV) line. Treatments, such as IV medications, can be given though a PICC. Blood
for laboratory tests can also be withdrawn from a PICC.

32

controlling the dog."

On March 31, 2009, plaintiff was seen by a nurse from Critical Care Systems (Tr. at 903). Plaintiff was observed to be calm, alert, and fully oriented. She reported intermittent pelvic pain but no other pain.

On April 1, 2009, plaintiff had an abdominal CT scan which showed the presacral/supravaginal space improved from 2.4 cm on March 18, 2009, to 10 mm on this day (Tr. at 538, 573-574, 721-722, 871-872).

On April 3, 2009, plaintiff saw Dr. Boulware for a follow up (Tr. at 562-563, 827-828). On exam no edema was observed in plaintiff's extremities. No complaints of mental health problems were noted, no observations of mental health concerns, and no mental health diagnoses were made. He assessed pelvic abscess, hypertension, acute renal failure, history of pulmonary emboli, and urosepsis secondary to E. coli resolved. He ordered lab work, continued plaintiff on the IV antibiotics and scheduled a repeat CT scan for April 15.

On April 6, 2009, plaintiff was seen by a nurse from Critical Care Systems (Tr. at 900). Plaintiff reported pain in her lower pelvis, said she was taking Norco (opioid pain reliever) as needed but "rare."

On April 14, 2009, plaintiff was seen by a nurse from Critical Care Systems (Tr. at 897). Plaintiff was observed to be calm, alert and fully oriented. Plaintiff's pain level was "none."

On April 15, 2009, plaintiff had an abdominal CT scan which was essentially unchanged from her scan two weeks earlier (Tr at 535, 551, 566, 719, 864-865).

On April 17, 2009, plaintiff saw Dr. Boulware for a follow up (Tr. at 557-558, 822-823). Because plaintiff still had an air pocket on her recent CT scan, Dr. Boulware indicated he would confer with Dr. Conner on Monday, April 20, about how much longer to continue

33

treating plaintiff with IV antibiotics. Plaintiff's physical exam was normal including no edema in her extremities. No complaints of mental health problems were noted, no observations of mental health concerns, and no mental health diagnoses were made.

On April 21, 2009, plaintiff was seen by a nurse from Critical Care Systems who observed that plaintiff was calm, alert and fully oriented (Tr. at 893). Plaintiff's pain level was "none."

On April 23, 2009, a nurse from Critical Care Systems removed the PICC line as plaintiff's IV therapy had been completed (Tr. at 890). Plaintiff was observed to be calm, alert and fully oriented. Her pain level was "none."

On April 29, 2009, Mark Altomari, Ph.D., completed a Psychiatric Review Technique (Tr. at 595-606). He found that plaintiff suffers from no restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation. In support of his findings Dr. Altomari noted the same records as those cited by Dr. Allen three months earlier and also noted the inpatient and outpatient treatment records in the past three months which indicate that plaintiff was not in any distress, no observations regarding mental health were made, her behavior had been unremarkable, and medical records did not indicate a history of any nervous breakdowns as alleged by plaintiff in her disability paperwork. Dr. Altomari also noted plaintiff's activities of daily living, inconsistencies in her description of problems, and conflicts between her self reported limitations and the medical records. Dr. Altomari also completed a Mental Residual Functional Capacity Assessment, and his findings were the same as those of Dr. Allen -- plaintiff is not significantly limited in any mental ability except the following: the ability to carry out detailed instructions and the ability to interact appropriately with the general public (Tr. at 607-609). Dr. Altomari found that plaintiff was

moderately limited in those two areas.

On April 30, 2009, plaintiff saw Dr. Boulware (Tr. at 819-820). Plaintiff had stopped the IV antibiotics the week before, complained of urinary tract infection, pain in both sides and in her low back, and plaintiff said she wanted to start back on Cymbalta but her co-pay was too high so she was wanting something else. Plaintiff's physical exam was normal except for pain/tenderness at the sacroiliac joint bilaterally. She had no edema in her extremities. Her psychological exam was normal. He assessed right and left sacroiliitis, gastritis, major depressive disorder, and pelvic abscess resolved. He prescribed Ranitidine for stomach acid reduction, Meloxicam (non-steroidal anti-inflammatory), and Fluoxetine (antidepressant) 20 mg a day with refills for a year, and he refilled her Klonopin (mood stabilizer). He injected her right and left sacroiliac ligament and joints with a steroid/lidocaine shot.

On June 1, 2009, plaintiff saw Dr. Boulware (Tr. at 816-817). "Patient wants to discuss getting CAT scan." Plaintiff indicated that she was still having back pain, worse since Friday. "Pt says seeing counselor on 10th of June & hired attorney." Plaintiff said she did not remember getting Ranitidine (reduces stomach acid), but the nurse noted that it was on the medical note from plaintiff's last visit. Plaintiff's psychological exam was normal. Her physical exam was normal in most respects; however, Dr. Boulware's writing is illegible with respect to plaintiff's sacroiliac joints. He indicated that plaintiff did not need a CT scan. "Discussed with the patient that Dr. Conner does not feel any further follow up or CAT scans are indicated or needed in regards to her recent pelvic abscess. He felt the remaining calcification represented scarring and would not significantly change with serial CAT scans." He told plaintiff to discontinue the Ranitidine since she was no longer having dyspeptic symptoms. He injected her right and left sacroiliac ligament and joint and her lower back with a steroid/lidocaine

shot.  He assessed right and left sacroiliitis, spinal enthesopathy[21] at L4/L5, and recent pelvic abscess.  He did not diagnose any mental health disorders including depression or anxiety.  He prescribed Soma, a muscle relaxer.

On June 2, 2009, plaintiff had an MRI of her lumbar spine due to complaints of back pain (Tr. at 717, 860).  The MRI revealed "mild contusion and/or very minor compression deformity."

On June 10, 2009, plaintiff saw Jennifer Salmons, LPC (Tr. at 675, 677).  The entire note deals with plaintiff's complaint that her long term disability insurance carrier had reported not having received anything from Ms. Salmons since December 2008.  Ms. Salmons agreed to fax the documents again.  She noted that because of plaintiff switching insurance companies, she would no longer be a provider for plaintiff.  No treatment was provided on this day.

On June 15, 2009, plaintiff saw Dr. Boulware for a follow up on the MRI of her lumbar spine (Tr. at 813-814).  The record states that plaintiff reported having fallen while "walking with walking boot backwards, injured back."  Plaintiff's physical exam was normal except for tenderness (where that tenderness was located is illegible); her psychological exam was normal.  Dr. Boulware assessed bilateral sacroiliitis improved, spinal enthesopathy at L4/L5 improved.  Dr. Boulware prescribed physical therapy.

On June 18, 2009, plaintiff had x-rays of her sacrum and sacrococcygeal region and her lumbar spine (Tr. at 858-859, 861, 863).  The scan showed intact sacral struts, normal sacroiliac joints, and scattered calcifications the pelvis compatible with phleboliths.[22]  The x-

---

[21]A disease occurring at the site of attachment of muscle tendons and ligaments to bones or joint capsules.

[22]Phleboliths are literally vein stones, and represent calcification within venous structures. They are particularly common in the pelvis.

rays of her lumbar spine showed probable subacute minor compression deformity of the superior end plate at L5[23] with preserved disc spaces.

On June 24, 2009, plaintiff saw Kenneth Luther from Madison Avenue Psych (Tr. at 919-922, 1580-1585). Plaintiff reported that she had issues with depression, anxiety, panic attacks, and coping with life in general. When asked how long she has had these problems, plaintiff wrote, "Probably for years. They all came to the surface in 8-08 because of a nervous breakdown." On a list of symptoms, plaintiff did **not** check tingling or numbness, difficulty concentrating, thoughts of harming others, trouble controlling her temper, violence toward others, hearing voices, memory problems, seeing things others don't, or racing thoughts. When asked to list any medical or physical problem, plaintiff included "possible spinal fracture at L5" in 2009; however, there are no medical records to suggest a possible spinal fracture.

Over the next 4 1/2 months plaintiff would see Mr. Luther on 16 more occasions. During those visits, plaintiff discussed her worries over a personal problem facing her daughter, her decision to sue her insurance company for failing to pay her for long term disability, her many health problems especially her neck and back, her worry over her sister's family failing to attend church, money problems, and her daughter's boyfriend facing jail time. Plaintiff reported that she sang at church in early August, overcoming her fear to do so. Plaintiff never mentioned hearing voices, memory problems, or concentration problems. In late fall, she indicated her therapy had been successful and her daughter "feels she has her mother back." Abruptly on October 6, 2009, plaintiff "talked about multiple personalities." A month later she reported that she was very nervous about her examination the following week

_____

[23]Vertebral end plates are the top and bottom portions of the vertebral bodies that interface with the vertebral discs. The vertebral end plate is composed of a layer of thickened cancellous bone. The force imposed on the end plate from major load bearing or a herniated disc can cause end-plate abnormality and dysfunction. Malformations and fractures in the vertebral end plate can be detected through MRI scan or discogram.

to determine whether she had multiple personalities. The next entry describing her sessions stated in its entirety, "She had her hearing on disability and is certain it will go through." (Tr. at 1583). Plaintiff's administrative hearing in this case had been held on November 19, 2009.

Meanwhile, on July 7, 2009, plaintiff had x-rays and an MRI of her lumbar spine and sacrum/coccyx due to complaints of back pain (Tr. at 712, 714-715, 857, 1683). The x-rays showed preserved disc spaces. The MRI revealed minimal disc bulge and "very minor" compression deformity. Plaintiff's sacrum and coccygeal region were normal.

On July 16, 2009, plaintiff saw Dr. Boulware for a follow up on her lumbar spine scans (Tr. at 806-807). Plaintiff complained that it hurt to sit, stand, walk or lie down. Her legs were giving out on her and she "falls back x1 week." She also reported that she was "depressed with long term disability stuff." Her exam was essentially normal; her psychological exam was normal. Dr. Boulware assessed spinal enthesopathy at L4/L5, right sacroiliitis,[24] left sacroiliitis, fibromyalgia, and degenerative joint disease. I note that 9 days earlier, plaintiff had undergone x-rays and an MRI which showed a normal sacrum and coccygeal region. No testing was done on this day for trigger points associated with fibromyalgia. The location of her degenerative joint disease was not identified, and in fact the exam notes reflect that her musculoskeletal exam was normal. Dr. Boulware gave plaintiff

--------

[24]"Sacroiliitis is an inflammation of one or both of your sacroiliac joints -- the places where your lower spine and pelvis connect. Sacroiliitis can cause pain in your buttocks or lower back, and may even extend down one or both legs. The pain associated with sacroiliitis is often aggravated by prolonged standing or by stair climbing. Sacroiliitis can be difficult to diagnose, because it may be mistaken for other causes of low back pain. It's been linked to a group of diseases that cause inflammatory arthritis of the spine. Treatment of sacroiliitis may involve a combination of rest, physical therapy and medications. . . . An X-ray of your pelvis can reveal signs of damage to the sacroiliac joint. If ankylosing spondylitis [a long-term type of arthritis] is suspected, your doctor might recommend magnetic resonance imaging (MRI) -- a test that uses radio waves and a strong magnetic field to produce very detailed cross-sectional images of both bone and soft tissues."
http://www.mayoclinic.org/diseases-conditions/sacroiliitis/basics/definition/con-20028653

Case 4:13-cv-00438-REL   Document 17   Filed 09/22/14   Page 38 of 95

steroid/lidocaine shots in both sacroiliac joints and in her lower back. He started her on Savella for fibromyalgia.

On July 30, 2009, plaintiff saw Dr. Boulware (Tr. at 809-810). She reported that she was "doing great" on the Savella. She reported that she began having neck pain a month ago that comes and goes. She reported that the injections helped her lower back pain but she continued to have that pain. Plaintiff's physical and mental exam were normal. Dr. Boulware assessed spinal enthesopathy now at the C4 level, fibromyalgia, and gastroesophageal reflux disease, although in the exam portion of the notes GERD had been denied and plaintiff's GI exam was marked normal. Dr. Boulware gave plaintiff a steroid/Lidocaine injection in her neck and prescribed Lidoderm patches with refills for one year.

On August 11, 2009, plaintiff saw Dr. Boulware with complaints of bilateral arm paresthesias,[25] neck pain, and low back pain (Tr. at 803-804). Plaintiff said she experienced terrible pain in her low back which radiated down her legs when she sat down in church. Plaintiff's exam was normal, including her psychological exam. Plaintiff underwent a nerve conduction study (Tr. at 851-855) which showed no significant radiculopathy and no significant left arm problems but "the right side showed a median neuropathy [nerve damage] but of undefined origin." He ordered x-rays and an MRI of plaintiff's cervical spine and refilled her Klonopin.

On August 14, 2009, plaintiff had x-rays and an MRI of her cervical spine after complaints of neck pain (Tr. at 709-710, 796-797, 18451847). Her x-rays were normal. Her MRI showed disc bulging at C4-C5, C5-C6 and C6-C7 which "does not touch or deform the cord" except at C4-C5 where is "touches but does not deform the cervical cord" and produces

_____

[25]An abnormal sensation of the body, such as numbness, tingling, or burning.

39

minimal left neural foraminal effacement.[26]

On August 28, 2009, plaintiff saw Dr. Boulware for a follow up on her cervical spine x-rays and MRI (Tr. at 795). Plaintiff's exam was normal, including her psychological exam (notably, "depression" was not marked as being present). Her medications were refilled.

On October 10, 2009, Dr. Boulware wrote a letter to whom it may concern (Tr. at 945, 948).

> This is a 47 year old patient of mine who has chronic intractable pain with cervical spondylosis that she rates that pain 9 on a 1-10 scale. Low back pain is also present which she rates a 7 out of 10 pain scale. She continues to have pain over the area of fracture. She has had a history of ulcerative colitis that was treated with Barnett Continent Ileostomy but unfortunately this has caused recurrent problems with bowel obstruction.
>
> She most recently had a prolonged illness for which she was hospitalized first in Florida, and later in North Kansas City Hospital for hysterectomy followed by complications of acute renal failure with her creatinine going 9.8. She had urosepsis, prolonged pelvic abscess. She has also had a history of pulmonary emboli, deep venous thrombosis, type 2 diabetes mellitus, generalized anxiety, and a major depression.
>
> She has tried through the years to work at various jobs but has had difficulty with her employers understanding she has periods of time when she has to be absent for prolonged periods of time for health reasons. It is my opinion she has gotten to the point where she is chronically disabled from a number of medical problems as described above. I do support her claim of disability.

On November 12, 2009, plaintiff had an MRI of her left ankle (Tr. at 946-947, 1572, 1844). Sinus tarsi syndrome[27] was suspected.

---

[26]Forminal effacement means obliterating or erasing an opening between vertebrae through which nerves leave the spine and extend to other parts of the body. In plaintiff's case, the obliterating of this opening was "minimal."

 [27]The sinus tarsi is a small cylindrical cavity found on the outside part of the hind foot. It sits between the talus and calcaneus (heel bone), an area known as the subtalar joint. A number of ligaments, blood vessels and nerves pass through the sinus tarsi. Inflammation around the Sinus Tarsi region or injury of any of the surrounding ligaments results in Sinus Tarsi Syndrome.

Case 4:13-cv-00438-REL   Document 17   Filed 09/22/14   Page 40 of 95

On November 13, 2009, plaintiff saw Dr. Boulware and reported that her insurance would not cover Lyrica (Tr. at 1655-1656). Plaintiff weighed 273 pounds. Her psychological exam was normal. Her physical exam was normal. He diagnosed fibromyalgia, sinus tarsi syndrome, ankle arthritis secondary to severe strain, and major depressive disorder. He increased her Fluoxetine since she was unable to get the Lyrica, and he administered a steroid/Lidocaine injection to her left ankle.

On November 25, 2009, plaintiff saw Dr. Boulware for a recheck on her foot (Tr. at 1652, 1654). Plaintiff weighed 277 pounds. Her psychological exam was normal. Her physical exam was normal. He assessed fibromyalgia and degenerative joint disease. He ordered blood work and refilled plaintiff's Savella with one year of refills.

On December 22, 2009, plaintiff saw Dr. Boulware and complained of sore throat and cough and chest pain "once in a while" for the past two weeks (Tr. at 1650-1651). She said her left foot was better, that the shots helped. Plaintiff's psychological exam was normal. Dr. Boulware assessed chest pain and sinus tarsi syndrome improved. He ordered blood work and an EKG which was normal (Tr. at 1703-1705). He refilled her Clonazepam, 90 tablets with three refills.

On December 24, 2009, plaintiff went to the emergency room at North Kansas City Hospital complaining of chest pain (Tr. at 1563-1570, 1696, 1841-1842). A myocardial perfusion scan was normal and showed a normal ejection fraction (69%).[28] A nuclear cardiac

---

[28]Ejection fraction is a measurement of the percentage of blood leaving the heart each time it contracts. During each heartbeat cycle, the heart contracts and relaxes. When the heart contracts, it ejects blood from the two pumping chambers (ventricles). When the heart relaxes, the ventricles refill with blood. No matter how forceful the contraction, it does not empty all of the blood out of a ventricle. The term "ejection fraction" refers to the percentage of blood that is pumped out of a filled ventricle with each heartbeat. The left ventricle is the heart's main pumping chamber, so ejection fraction is usually measured only in the left ventricle (LV). An

stress test[29] was normal.

On December 29, 2009, Michael Farber, M.D., responded to a letter from plaintiff's disability insurance carrier (Tr. at 1727-1732). Dr. Farber had reviewed all of plaintiff's medical records. Dr. Farber was asked to compare plaintiff's condition before August 16, 2008, and after. He noted that her bowel condition had been present for many years and had been relatively stable with periodic recurrent small bowel obstructive symptoms requiring surgical intervention prior to and after August 16, 2008. Dr. Farber noted that the medical records do not indicate whether plaintiff engaged in physical therapy as recommended for her musculoskeletal conditions. She had improved with localized steroid injections. There was no chronic use of opioid medication for pain control. No detailed trigger point assessment or history of invasive trigger point injection confirmed the diagnosis of fibromyalgia which did not support a restriction of her activities based on this diagnosis. Dr. Farber's opinion was that plaintiff should be restricted to lifting 20 pounds occasionally and up to 10 pounds frequently. She should be able to sit or stand provided she has the ability to change positions occasionally for comfort. "She would be able to work full time." Dr. Farber believed these restrictions should be permanent.

On December 30, 2009, Thomas Gratzer, M.D., a forensic psychiatrist, responded to a letter from plaintiff's disability insurance carrier (Tr. at 1733-1738). Dr. Gratzer reviewed all of plaintiff's medical records and was asked to compare her condition before and after August

---

LV ejection fraction of 55 percent or higher is considered normal.

[29]A nuclear stress test measures blood flow to the heart muscle both at rest and during stress on the heart. It provides images that can show areas of low blood flow through the heart and areas of damaged heart muscle. A nuclear stress test usually involves taking two sets of images of the heart -- one set with medication that stresses the heart, and another set while the patient is at rest. A nuclear stress test is used to gather information about how well the heart works during physical activity and at rest.

Case 4:13-cv-00438-REL   Document 17   Filed 09/22/14   Page 42 of 95

16, 2008.  He noted that medical records dated after November 4, 2008, do not mention any mental condition suggesting that her symptoms were no longer acute or not present.  Medical records from October 6, 2008, through July 20, 2009 "do not indicate that Ms. White is psychiatrically impaired, limited or restricted."  The medical records to that point were lacking objective psychological testing to support plaintiff's subjective complaints.  Plaintiff's mental health providers had not indicated that plaintiff was psychiatrically impaired, limited or restricted.  "Treatment records indicate Ms. White has significant job dissatisfaction and perceives a negative work environment. This is separate from a psychiatric impairment, limitation or restriction."  Dr. Gratzer noted that subacute depressive and anxiety symptoms do not require significant mental health treatment, and plaintiff had not had significant mental health treatment, although he questioned her compliance as "I do not believe it was recommended that she have a gap in treatment from 1/7/09 through 6/09 with respect to her psychotherapy."

On January 14, 2010, plaintiff saw Dr. Boulware (Tr. at 1646, 1648, 1701-1702).  She complained of a runny nose and lower back pain.  She also reported that the fingers in her right hand had been going number for about one month.  He assessed bilateral hand paresthesias, hypertension, chronic sinus infection, vitamin B12 deficiency, degenerative joint disease, fibromyalgia, and diabetes.  He switched her muscle relaxer to Zanaflex because her insurance would not cover Flexeril, told her to stop the Meloxicam and started Diclofenac (both non-steroidal anti-inflammatories), and obtained bilateral nerve conduction studies.  "Fortunately no significant radiculopathy or entrapment syndrome noted."  The nerve conduction study showed that plaintiff's nerve conduction study for both arms was entirely normal (Tr. at 1702).

On January 19, 2010, Richard Kaplan, M.D., board certified in pain management, responded to a letter from plaintiff's disability insurance carrier (Tr. at 1739-1746). "Given the limited functional assessment data, I can only estimate the claimant's restrictions and limitations. In my opinion a reasonable estimation of the claimant's minimum level of physical ability would be consistent with standing or walking 1-4 hours per day, no squatting, balancing or kneeling, lifting up to 15 pounds. "I would recommend these for her initial return to work functions, and I would recommend reevaluation at six-month intervals. . . . [T]he evidence for any specific spinal condition or physical rehabilitation condition is very debatable. . . . Solely from a physical rehabilitation perspective, there is minimal information to suggest any specific impairment restrictions or limitations other than those that may be indicated on a short term basis due to deconditioning related to the claimant's acute illness. . .. I do note that the claimant is reported to have a history of a talus fracture as above, which likely produced substantial impairment for a brief period of time and again there is little objective physical examination or functional assessment data to understand this more clearly."

On February 3, 2010, plaintiff went to the emergency room at North Kansas City Hospital complaining of off and on vomiting and diarrhea (Tr. at 1539-1561, 1818-1838). Her psychological exam was normal. Her back was normal; her extremities were normal with no tenderness and normal range of motion. Abdominal and chest x-rays were normal except for nonspecific bowel gas distribution. EKG was normal. She was given an antibiotic and nausea medication.

On March 1, 2010, plaintiff went to the emergency room at North Kansas City Hospital complaining of feeling faint and having diarrhea (Tr. at 1453-1537, 1682, 1689-1695, 1714-1719, 1749-1816, 1848-1915). Plaintiff's family had been ill with gastrointestinal issues, she reported diarrhea for several days, and that morning when she tried to get out of bed she felt

lightheaded and fell out of bed although she was not injured in that fall. Her medical history included depression but no other mental condition. Plaintiff complained of lower back tenderness and appeared to be in "mild discomfort," otherwise her musculoskeletal system was unremarkable. An electrocardiogram was normal. X-rays of her back were normal. X-rays of her face due to falling out of bed were normal. She had low blood pressure which was a result of dehydration from diarrhea. She was assessed with diarrhea and acute renal failure caused by dehydration. She was admitted and improved rapidly with IV fluids. Plaintiff was treated by Dr. Boulware while hospitalized. The overall impression included 13 diagnoses, none of which involved a mental condition (Tr. at 1464). Gastroenterologist Yan Chen, M.D., consulted during plaintiff's admission and observed that she appeared comfortable. During her exam no edema was noted in her extremities. Endocrinologist Howard Rosen, M.D., consulted during her admission and observed that plaintiff had no edema in her extremities. Cardiologist Michael Farrar, M.D., consulted during her admission and observed that she was alert and oriented and in no acute distress although she appeared ill. She had no edema in her extremities. At no time during this five-day stay did any medical professional observe any unusual behavior by plaintiff; plaintiff did not complain of any mental symptoms during this hospitalization. She was discharged on March 5, 2010.

On March 16, 2010, plaintiff saw Dr. Boulware for a follow up on her hospitalization (Tr. at 1644-1645). She weighed 290 pounds. She was assessed with acute bronchitis/sinus infection, flu like syndrome, and recent acute renal failure/hypotension. He prescribed antibiotics.

On April 15, 2010, plaintiff saw Dr. Boulware for a sinus infection (Tr. at 1641-1642). Plaintiff also questioned whether she had fibromyalgia because her elbows hurt and she was experiencing loss of strength in her hands. Plaintiff weighed 288 pounds. Her psychological

45

exam was normal. Her physical exam was normal except she had tenderness to palpation over both left wrists and elbows. Dr. Boulware assessed right and left epicondylitis,[30] right plantar fascial fibromatosis,[31] acute bronchitis and sinus infection, fibromyalgia, and degenerative arthritis. He prescribed Tramadol (non-narcotic pain reliever) for fibromyalgia. He administered steroid/Lidocaine injections to her elbows and her right plantar fascia.

On May 17, 2010, plaintiff saw Dr. Boulware and complained of right elbow pain with no associated injury (Tr. at 1639). Plaintiff said she wanted testing done to see if she has multiple sclerosis. "Loosing [sic] her mind, under a lot of stress. Life not good. Father broke hip 7/4/09." Plaintiff was assessed with right lateral epicondylitis and major depressive disorder with generalized anxiety. He gave plaintiff a steroid/Lidocaine injection in her elbow and referred her to Dr. Malik to discuss multiple sclerosis. "Advised the patient she is under a continued amount of stress with the constant care of her mother and with her underlying illnesses herself, this is way more than she should be doing at the present time. I suggested she recommend to her mother she recommend a nursing home or some additional help presently." He continued her on the same dose of Clonazepam (anti-anxiety) and Fluoxetine (antidepressant).

On June 17, 2010, plaintiff saw Dr. Boulware and complained of continued stumbling (Tr. at 1638). She said she fell the day before and now has shoulder pain. Plaintiff's

---

[30]Epicondylitis, also known as tennis elbow, is an inflammation of the tendons that join the forearm muscles on the outside of the elbow. The forearm muscles and tendons become damaged from overuse -- repeating the same motions again and again. This leads to pain and tenderness on the outside of the elbow.

[31]Plantar fibromatosis is a rare condition in which benign tumors called plantar fibromas grow on the bottom (plantar surface) of the foot. The plantar fascia is a long band of connective tissue that runs from the heel to the toes on the bottom of the foot. Plantar fibromas are firm masses that grow slowly along the plantar fascia, and they contain excess collagen or fibrotic tissue.

Case 4:13-cv-00438-REL   Document 17   Filed 09/22/14   Page 46 of 95

psychological exam was normal. Her physical exam was normal except she had pain over the left shoulder. There is no treatment listed on this record.

On June 28, 2010, plaintiff went to the emergency room at North Kansas City Hospital complaining of chest pain, urinary tract infection and diarrhea (Tr. at 1410-1451, 1686-1688, 1708-1713, 2475-2504). Her psychological exam was normal. Her physical exam was normal including her extremities which had no tenderness or edema. She was assessed with acute gastroenteritis (stomach flu), dehydration, urinary tract infection, atypical chest pain, "history of acute renal failure on 2 separate occasions with severe diarrhea". A CT pulmonary angiogram showed no thromboembolism. Chest CT scan was normal. Chest x-rays were normal. Abdominal x-rays were normal. She was kept overnight to receive IV fluids. Plaintiff was treated by Dr. Boulware during this visit, and no mental symptoms were noted or assessed.

On July 1, 2010, plaintiff had an MRI of her brain and left shoulder due to complaints of poor balance, dizziness, shoulder pain, and difficulty walking (Tr. at 1402-1408, 1681, 1684-1685, 1817, 2468-2471). The scans showed mild white matter disease, likely chronic;[32] partial opacification of the mastoid air cells bilaterally,[33] partial-thickness tears of shoulder tendons, and evidence of a shoulder dislocation.

On July 2, 2010, plaintiff saw Dr. Boulware complaining of continued back pain (Tr. at 1632-1633). Plaintiff weighed 246 pounds. Her psychological exam was normal. Her physical exam was normal. Dr. Boulware assessed spinal enthesopathy to the left of T10, back

---

[32]White matter disease is a progressive disorder caused by age-related decline in the part of the nerves (the white matter) that connect different areas of brain to each other and to the spinal cord. This disorder can result in imbalance and lead to problems with mobility in older age. It is usually diagnosed when no other causes for balance problems can be found, and when an MRI of the brain shows specific changes to the white matter.

[33] The mastoid bone, which sits behind the ear, consists of air spaces that help drain the middle ear. Partial opacification of these air cells means partially fluid-filled.

pain which he said could be related to the enthesopathy or tenderness related to a urinary tract infection, and diabetes. He ordered lab work and gave plaintiff a steroid/Lidocaine injection in her back. He reviewed plaintiff's MRI and noted in his treatment plan that he referred plaintiff to Truman Medical Center Ortho for "partial thickness tear in the infra spinatous, supra spinatous and labral areas. The patient has intermittent anterior dislocation of the shoulder consisted with Hill-[S]ach Syndrome."[34]

On July 12, 2010, plaintiff saw Dr. Boulware complaining of leg cramps (Tr. at 1635). It appears that part of this record is missing as there is nothing except a complaint.

On July 19, 2010, plaintiff went to the emergency room at North Kansas City Hospital complaining of abdominal pain (Tr. at 1384-1401, 2441-2466). Her psychological exam was normal. Her physical exam was normal except tenderness in the area of her reported pain.

_____

[34]A Hill-Sachs injury to the shoulder occurs as the result of a shoulder dislocation. A shoulder dislocation is often confused with a separated shoulder, but these are very different injuries. When a shoulder dislocation occurs, the ball of the ball-and-socket shoulder joint comes out of position. Usually, when this injury occurs for the first time, someone must reposition the shoulder joint, often in a hospital or emergency department. The shoulder joint is made up of the ball on the top of the arm bone (the humerus), which is called the humeral head. The socket of the shoulder is part of the scapula (the shoulder blade) called the glenoid. Helping to hold the ball in the socket are ligaments, cartilage, and tendons. When a shoulder dislocation occurs, the normal structures that hold the ball inside the shoulder socket are damaged. Damage to the shoulder is mostly dependent on the age of the patient who sustained the injury. The usual damage is either to the shoulder ligaments, called a Bankart tear, which occurs in younger patients. In older people who dislocated their shoulder, the usual injury is to the rotator cuff tendons. In addition to ligament or tendon damage, the bone and cartilage can also be damaged; the most common type of damage is referred to as a Hill-Sachs defect. The Hill-Sachs defect occurs when there is injury to the bone and cartilage of the humeral head. As the humeral head dislocates from the socket of the shoulder joint, the round humeral head strikes the edge of the socket with force. This creates a divot in the humeral head called a compression fracture. This divot is often seen on MRI, and larger Hill-Sachs injuries may also be seen on an x-ray. A Hill-Sachs defect does not occur in isolation, meaning there is always other damage that allowed the shoulder to dislocate. The Hill-Sachs defect is often used to confirm that the shoulder did come completely out of socket, rather than just partially dislocated, as occurs in subluxation. A Hill-Sachs defect occurs in about half of first-time shoulder dislocations, and is almost always seen in people who have recurrent shoulder instability from multiple previous dislocations.

Her extremities were normal with no tenderness or edema and normal range of motion. She had a CT scan of her chest, abdomen and pelvis which were normal with no evidence of pulmonary embolus. She was assessed with "abdominal pain, unknown cause" and was told to follow up with her primary care physician.

On July 27, 2010, plaintiff saw Dr. Boulware (Tr. at 1629-1630). She reported abdominal pain and she said she could not walk without stumbling, her hips hurt and her legs were tired. Plaintiff needed to set an appointment for Family Services to get a GAF score to see if she still qualified for Medicaid. Her psychological exam was normal. Dr. Boulware assessed abdominal pain of questionable etiology and dysequilibrium. He told her to follow up with neurology.

On August 24, 2010, plaintiff saw Dr. Boulware and complained of a mole she had had on her face for a long time and she said she was still having leg cramps (Tr. at 1626-1627). Plaintiff weighed 222 pounds. Her psychological exam was normal. Her physical exam was normal except he noted muscle spasm in her extremities. He removed the mole on her face and assessed probable basal cell carcinoma and muscle spasms. He prescribed Noflex, a muscle relaxer.

On August 30, 2010, plaintiff saw Dr. Boulware and complained that she was having lower back pain and knee pain (Tr. at 1624-1625). Her psychological exam was normal. Her physical exam was normal except her extremities were not examined. Dr. Boulware assessed spinal enthesopathy at L5, diabetes, fibromyalgia, and degenerative joint disease. He gave her a steroid/lidocaine shot in her lower back.

On September 9, 2010, plaintiff underwent an MRI of her lumbar spine which showed small L4 vertebral body hemangioma along the upper end plate but otherwise normal findings with no evidence of a disc protrusion or extrusion, spinal stenosis or neural foraminal stenosis

49

(narrowing) (Tr. at 1376, 1680, 2439). She had mild degenerative disc disease at L1-L2 and L2-L3, and facet degenerative changes at L3-L3, L3-L4 and L5-S1.

On September 13, 2010, plaintiff saw Dr. Boulware to talk about her kidney function, to go over her lumbosacral MRI, and complaining of still having leg cramps (Tr. at 1621-1622). Plaintiff's psychological exam was normal. Her physical exam was normal. Dr. Boulware assessed muscle cramping, chronic renal failure, diabetes, and ulcerative colitis. He did not diagnose any mental condition. He ordered lower extremity nerve conduction studies.

On September 20, 2010, plaintiff underwent an EMG, a motor nerve conduction test and a sensory nerve conduction test due to complaints of leg weakness, poor balance, and a tendency to fall with increased myalgia and cramping (Tr. at 1367-1374, 1697-1698, 2434-2435). Fred Sachen, M.D., found generalized peripheral neuropathy.[35] There was no evidence of myopathy[36] or radiculopathy.[37]

On October 11, 2010, plaintiff saw Dr. Boulware to go over test results (Tr. at 1616-1617). She also reported nausea the night before and said she wants to sleep a lot. Plaintiff asked about a urologist appointment. She weighed 200 pounds. Her psychological exam was normal. Her physical exam was normal. She was assessed with possible poor bladder emptying, multiple falls, and neuropathy, although the treatment record does not mention anything about falls or neuropathy. Plaintiff was not assessed with any mental impairment.

_____

[35]Peripheral nerves carry information to and from the brain. They also carry signals to and from the spinal cord to the rest of the body. Peripheral neuropathy means these nerves do not work properly. Peripheral neuropathy may be damage to a single nerve. It may be damage to a nerve group.

[36]Myopathy refers to a clinical disorder of the skeletal muscles.

[37]A consequence of nerve root damage.

50

On October 15, 2010, plaintiff saw Thomas Herrick, M.D., at the request of Dr. Boulware for further evaluation of possible urinary retention (Tr. at 1303, 2020). "Her voiding complaints consist of a sensation of incomplete emptying. She denies urinary incontinence." Dr. Herrick recommended urodynamic evaluation.[38]

On November 1, 2010, plaintiff was seen at Tri-County Mental Health Services claiming to have identified five different personalities in her multiple personality disorder (Tr. at 1589, 1938-1941).

> Robin is living with her parents and caring for her mother who has stage 4 brain cancer. She says that her siblings do not help. . . . She is very troubled by report of her being born a twin, one died at birth. She reports a lot of anger and resentment. The idea of the twin impacts her in the way that she claims to have multiple personality/AH of identified personalities. She reports a lot of anger and SI/HI. . . . She believes her mother is able to remember things but is "pretending"to not remember certain things. Robin . . . is filing for disability. She saw Dr. Urie for Medicaid evaluation and was told her GAF is 54. Owns a home, but sleeps at parents' home as she is caring for them.
>
> . . . [Plaintiff] hears at least 5 voices 2 men and 3 women. She has different names for each voice, and they have distinct personalities. Robin attempted to dominate the interview through her accounts of various situations with her mother. She says that mostly she feels trapped by her mother needing care and wants to escape, has considered inpatient psych hospitalization but never followed through. . . . [She] has considered a plan a few weeks ago (to fall back off of a ravene [sic] in lakeside nature center), but was deterred by her mother needing to go to a historical organization meeting. Her SI [suicidal ideation] is generated by a male voice she hears. Lately she is considering donating her body to science, and in this case she thinks she needs to plan for that. She says that if it doesn't cost anything to donate her body, she has the idea that she could OD [overdose]. Discussed the idea of going to inpatient hospitalization.

---

[38]Urodynamic tests for urinary incontinence are measurements taken to evaluate the bladder's function and efficiency. The actual tests done vary from person to person. Some urodynamic tests are relatively simple and can be done in a doctor's office. Other tests require expensive and sophisticated instruments to measure the amount of pressure experienced by the bladder and urethra. For basic urodynamic testing, the patient will be instructed to arrive for testing with a full bladder. While the patient urinates into a container, the volume of urine and the rate at which the bladder empties are measured. A thin, flexible tube (catheter) is then inserted into the bladder through the urethra, and the volume of any urine remaining in the bladder is measured (post-void residual, or PVR). The bladder may be filled with water through the catheter until the patient has the first urge to urinate. The amount of water in the bladder is measured at this point. Then more water may be added while the patient resists urinating until involuntary urination occurs.

She says she doesn't want to go as her mother would be looking for her and she has no other person to help take care of her mother. She has also promised to her mother and feels strongly about not letting her go to a nursing home. She says that as badly as she wants to escape, she has a lot of reasons not to.

In a mental status exam, plaintiff was observed to be appropriately dressed, cooperative, with normal motor activity, good alertness, intact orientation, excessive speech, blunted affect. She had good concentration, intact thought content, average intellect. Her memory was intact, her attention was good, her mood was dysphoric. Her judgment was impaired and insight was poor. She was assessed with mood disorder not otherwise specified and personality disorder not otherwise specified. Her GAF was 60.[39]

On November 3, 2010, Candice Leimkuhler, LPC, with Tri-County Mental Health Services called plaintiff to monitor her status (she was on high risk to self and other status) and offer support (Tr. at 1601, 1930). "Ct said her day was going well. She sounded cheerful. Ct said she was on the other line with a family member, so she could not talk. . . . Ct seemed to be in a pleasant mood and was receptive to support."

That same day plaintiff saw Dr. Herrick for urodynamic evaluation (Tr. at 1300). The results were "large capacity bladder with normal bladder function" and "no evidence for intrinsic sphincter deficiency."

On November 10, 2010, plaintiff underwent a Psychiatric Evaluation by Mary Chance, a board certified psychiatric and mental health clinical nurse specialist at Tri-County Mental Health Services (Tr. at 1591-1593, 1935-1937). Plaintiff complained of depression, anxiety, and hearing voices. She reported suicidal thoughts off and on, most recently a plan to jump off a cliff.

---

[39] A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

She says she hears voices. She says she hears 5 different ones. She said sometimes they get her to think about killing herself. She says the voices started just this last year. She has names for all her voices. She said she doesn't think she needs to go to the hospital. She said she would never kill herself because her parents need her treatment. Sometimes she says she feels resentful for having to be there [sic] primary care giver. She has 3 sisters and one brother. She said they did not help with her parents at all. Her parents are in poor health. Her mom has brain cancer. She says sometimes she just thinks about running away. . . .

. . . She did report having some thoughts of killing herself by jumping off a cliff but she said she didn't do it because she needed to take her mother to a historical Society meeting and her daughter wanted her to take her somewhere as well. . . .

. . . Client says she has not used any alcohol at all in over the last 2 years because of her kidney problems. She said alcohol has ever [sic] been a problem in the past. She said she used marijuana when she was a teenager.

Client owns a house but she is currently staying with her mom and dad to take care of them. Her 26-year-old daughter is staying in her house. . . . She has applied for disability do [sic] to her physical problems. She has three sisters and one brother but she is not close to them. She recently them [sic] for not helping with her parents more. She said she would like to kill her brother . . . her sister . . . and their spouses. She said if she had a gun she would bite down with bailing wire, gage been [sic], shout and then shoot them. She said they are shellfish [sic] and thoughtless. She said she would never really do anything to them she denies any legal problems. . . . She says she likes to go to the Lakeside [N]ature Center. . . .

Client was pleasant and cooperative. She was alert and oriented. Her thoughts were clear. There was no apparent psychosis. Her grooming and hygiene was [sic] good. She maintained good eye contact. Her affect was flat. She denied any current thoughts of hurting herself or anyone else. Client did say she hears voices most of the time. . . . Her intellect was judged to be average per her vocabulary and general fund of knowledge. Her insight and judgment seems [sic] to be grossly intact.

Client report is and [sic] symptoms of depression and anxiety. She reports constant voices. She has names for the voices but they are not voices that she recognized from the real world. She says she thinks she might have a dissociative kind of disorder. She denies any history of abuse however. . . . She denies any current thoughts of suicide. She does say she would never act on any thoughts because of her parents and her daughter. Client did report some thoughts of killing her brother and one of her sisters and their spouses. She said she would never do that.

Axis I:          Schizoaffective disorder, anxiety disorder not otherwise specified

Axis II:          Rule out personality disorder

* * * * *

53

| Axis IV: | Severe chronic health problems, financial stressors, family conflict |
| Axis V: | 55 |

Plaintiff said she wanted to keep taking Prozac (an antidepressant also called Fluoxetine), so her dose was increased and she was prescribed Abilify for the voices.

On November 16, 2010, Jenny, from plaintiff's disability lawyer's office, called Tri-County Mental Health Services (Tr. at 1600-1601, 1929-1930). "Jenny reported that ct reported plans she has thought of, such as tying her family up and shooting them, and then killing herself. Ct reportedly did not express intent to act on these thoughts and scheduled her next appt with [the lawyer] for November 23rd. Writer called to assess status and offer sooner psychiatric appointment. Ct was very pleasant and talkative with this writer. She said she is doing 'alright' but is stressed over her disability case." Plaintiff denied current suicidal ideation. Ct said that she sometimes still has thoughts about harming her family but she has no intention of acting on those thoughts at this time. Plaintiff said she continued to have auditory hallucinations "as much as she was at the time of the last contact with writer (11/2)." Plaintiff said her good voices are trying to compromise with her bad voice, Ian, to keep her alive. Plaintiff was offered an appointment with Grant Piepergerdes, M.D., the psychiatrist, the next day, and plaintiff was pleased at being able to get in sooner. "Ct does not appear to be at imminent risk of harm to herself or others today, so hospitalization is not recommended today."

On that same day, November 16, 2010, plaintiff was seen at Northland Psychological Services for a counseling session from 3:00 to 4:00 p.m. (Tr. at 1316-1317). Plaintiff reported having had a nervous breakdown in 2008 and said she had not been the same person since. "Client reports she has anger issues. Client reports that last year she started hearing voices. She reports they speak clearly to her and she thinks that they are parts of herself except for one

54

which is a demon. Client reports that there is one part of her that speaks to her that is named 'Emily' who is 5 years old with long blonde hair. Client reports that 'Emily' sings to her at night. . . . Client processed stressors with caring for her parents. Client reports that in May she bought a house but has not stayed one night in the house. Client reviewed a past hospitalization where she had a plan to get a gun and kill her parents, daughter, and herself." The form lists "no" for both suicidal ideation and homicidal ideation. The therapist noted that it was difficult for plaintiff to stay on track during the session.

On November 17, 2010, plaintiff saw Dr. Piepergerdes at Tri-County Mental Health (Tr. at 1599-1600, 1928-1929). Plaintiff reported that she continued to have thoughts of killing her brother and sister. "She feels frustrated toward them because they are not helping much taking care of their parents. She states that if she had a gun she would use it. She states she senses that she has a demon on the right side name[d] Ian and 5 other voices on the left side that she has named. They do tell her to do things including one of the voices told her to change her bra this morning to match her shirt." Plaintiff was observed to be cooperative and casually dressed with good grooming and hygiene. Eye contact was fair. Speech was normal. Thought processes and content "show hallucinations which are command hallucinations and delusions. Her affect is constricted and tearful." Dr. Piepergerdes believed that plaintiff presented a danger to others and possibly herself and he decided to hospitalize her involuntarily. A clinician contacted plaintiff's brother to inform him of plaintiff's threats against him. He "said he was aware of the situation and thanked clinician for the call." Plaintiff's sister was called. She "was calm and also reported that their parents tend to reject help from [her] and [her brother], even though they need the help. [She] said thank you for the call." Plaintiff was very tearful about having to go into the hospital and indicated her regret at having come to see Dr. Piepergerdes that day.

55

Plaintiff was admitted to St. Luke's Northland until her discharge on November 23, 2010, and was treated by Syed Jaffri, M.D. (Tr. at 1995-2006). Plaintiff said "she was admitted because she was duped. The patient said she is taking care of elderly parents, both are sick, and been dealing with her depression, anxiety, and panic attacks. The patient said that her family members are not helping her out. She is feeling all stressed out and was also hearing voices. The patient said that she was just feeling frustrated when making those threats about hurting her sister and brother. She says she did not really mean to. The patient has a long history of mental illness. . . . The patient was somewhat vague and evasive about symptoms. Admitted to being depressed, unhappy, hopeless, helpless, and some auditory and visual hallucinations. Did not provide much detail. . . . Considering the patient was feeling better, her depression seemed fine, she had been free from being homicidal or suicidal while she was on the unit, it was decided it was time to discharge the patient. When the time came the patient declined, she says she is not ready and her discharge was cancelled and she was discharged the next day. At the time of discharge the patient did not have anymore homicidal or suicidal thoughts." Dr. Jaffri noted that plaintiff was "not a good historian and not a reliable person." (Tr. at 1998). "She reports having multiple personalities but she did not report to this writer. The patient was kind of vague and evasive about her symptoms" (Tr. at 1998).

During an examination by Andrew Niewald, M.D., on the day after her admission plaintiff was observed to be alert and oriented with a cooperative attitude, language was normal, intelligence was average, her memory and concentration were mildly impaired, she was attentive with normal psychomotor activity. Her mood was depressed, her speech was normal. "She has somewhat of an odd affect" (Tr. at 2003). Her gait was stable, she was fully oriented. "Toxicology screen is positive for opiates." The last medical record showing any

56

opioid medication was from April 6, 2009, when plaintiff told a home health nurse that she was taking Norco. Her last opioid prescription was from March 6, 2009, when she received a prescription for Darvocet, which is acetaminophen and propoxyphene. Norco is hydrocodone, which is not the same as Darvocet. It is unclear where plaintiff got the prescription for Norco, and it is unclear why her toxicology screen would be positive for opiates since she had not been prescribed them for some time. Plaintiff complained of back pain. "For now we will keep her on the Ultram [non-narcotic pain reliever] and just observe her pain complaints." Her Prozac was discontinued and Celexa was started. Abilify was continued. Plaintiff was discharged on November 23, 2010.

On November 30, 2010, plaintiff saw Dr. Herrick to discuss the results of her urodynamic evaluation (Tr. at 1301-1302, 2017-2019). On exam plaintiff had "no leakage with coughing and straining with a full bladder". She was assessed with normal bladder function and "incomplete emptying by history." Dr. Herrick reassured plaintiff. "She has essentially normal bladder function and position. I do not think her lower urinary tract is contributing to her renal insufficiency. I do not think she needs further evaluation or management at this point. She can continue with her current bladder management program, which is to allow her to have normal voiding."

On December 1, 2010, plaintiff was seen at Northland Psychological Services for a counseling session (Tr. at 1318-1319). Plaintiff reported that her psychiatrist had her hospitalized over a week ago for homicidal and suicidal thoughts. "Client talked about how her Abilify is supposed to control the voices she hears. Client talked about how 'Peter', her comic relief, has been telling her jokes today." Plaintiff denied homicidal or suicidal ideation.

On December 8, 2010, plaintiff saw Dr. Piepergerdes at Tri-County Mental Health (Tr. at 1598-1599, 1927-1928). She said that it had been like "a night and day difference" from

57

now compared to when she went to the hospital. She said her Prozac had been changed to Celexa and she was tolerating it well. Her Abilify had been kept at the same dose. She had been taken off Klonopin. "She states that she is no longer hearing any voices and no longer harbors any ill will towards her brother and sister. She has met with them several times and they are getting along fine. The patient states that going to the hospital was lifesaving for her. There is no suicidal or homicidal ideation." Plaintiff did not tell Dr. Piepergerdes that "Peter" had been telling her jokes one week earlier as she reported to a counselor at Northland Psychological Services. Plaintiff was described as cooperative and casually dressed with good grooming and hygiene. Eye contact was good, speech was normal. Thought processes were clear. Affect was level. She was assessed with schizoaffective disorder. Plaintiff was continued on Celexa. Her Prozac and Clonazepam (anti-anxiety) were discontinued. Abilify was continued. Plaintiff reported that she liked the groups in the hospital. Group therapy was encouraged.

On December 15, 2010, plaintiff called Tri-County Mental Health and requested a refill of clonazepam (Tr. at 1598, 1927). Dr. Piepergerdes denied the request.

On December 17, 2010, plaintiff again called Tri-County Mental Health and requested a refill of clonazepam (Tr. at 1597, 1926-1927). Dr. Piepergerdes denied the request. Plaintiff indicated she would ask her PCP to prescribe it instead.

On December 27, 2010, plaintiff saw Dr. Boulware complaining of almost daily nosebleeds and also reported that she had lost over 100 pounds and wanted to discuss when to stop losing weight. Plaintiff reported that she had been hospitalized the month before for being homicidal and suicidal and hearing voices. Plaintiff weighed 187 pounds. Her psychological exam was normal. Her physical exam was normal including her extremities and neck. She was assessed with diabetes, epistaxis (nose bleed), and major depression with recent suicidal

58

ideation status post recent psychiatric admission.

On January 14, 2011, plaintiff saw Dr. Piepergerdes at Tri-County Mental Health (Tr. at 1596-1597, 1925-1926). Plaintiff reported "doing reasonably well despite several deaths in her life recently. . . . She denies hearing voices or having psychotic symptoms. Her mood is generally good, just going through grief." Plaintiff reported no suicidal or homicidal ideation and no problems with medication. Plaintiff was observed to be cooperative and dressed casually with good grooming and hygiene. She made good eye contact. Her speech was normal, her thought processes were clear, her affect was level. She was assessed with schizoaffective disorder and bereavement. Plaintiff's prescriptions were refilled, and Dr. Piepergerdes recommended a grief support group.

On January 17, 2011, plaintiff went to the emergency room at North Kansas City Hospital complaining of right flank pain and cold symptoms (Tr. at 1348-1366, 2406-2430). Her psychological exam was normal. Chest x-rays were normal. EKG was normal. She was assessed with an upper respiratory infection.

On January 24, 2011, plaintiff saw Dr. Boulware complaining of a cold for the past three weeks (Tr. at 1611). Her psychological exam was normal. Her physical exam was normal including her extremities and neck. She was assessed with a sinus infection and given antibiotics. "Filled out a functional test with the help of the patient on what the patient can and cannot do with the patient's present limitations."

On January 26, 2011, plaintiff was seen at Northland Psychological Services for a counseling session (Tr. at 1320-1321). Plaintiff reported that her mother died on December 19.

On February 14, 2011, plaintiff saw Mary Chance at Tri-County Mental Health (Tr. at 1595-1596, 1924-1925). Plaintiff reported having to call the crisis hotline recently due to an

59

anxiety attack and they were very helpful. Her mother had passed away on December 19 and her dad had not been doing well since then. "She said she hears voices sometimes." Plaintiff was observed to be pleasant and cooperative, alert and oriented. Her thoughts were clear. There was no apparent psychosis. Her grooming and hygiene were good. She maintained good eye contact. Her affect was appropriate. She denied having any thoughts of hurting herself or others. Her Abilify was increased "to see if that would help get rid of the voices."

On February 28, 2011, plaintiff was seen at Northland Psychological Services for a counseling session (Tr. at 1322). Plaintiff had recently joined the Community Center. She also talked positively about having met a man three weeks ago who had been bringing his teenaged daughter over to plaintiff's house for dinner. Plaintiff had no suicidal or homicidal ideation.

On March 9, 2011, plaintiff was seen at Northland Psychological Services for a counseling session (Tr. at 1323). Plaintiff had been going to the community center for exercise. She said things were going well with her and her boyfriend. She said she enjoys being around children. "Therapist commented on client's positive attitude and seeming happy." Plaintiff said her Abilify had been increased and she was no longer hearing voices.

On March 17, 2011, plaintiff was seen by Mary Chance at Tri-County Mental Health (Tr. at 1594-1595, 1723, 1923). Plaintiff brought her new boyfriend's teenaged daughter with her. Plaintiff said taking Abilify in the morning made her too drowsy; Ms. Chance wrote, "I recommended she take it at bedtime." Plaintiff stated that taking it at 5:00 p.m. "seems to be working well." Things were going well with her new boyfriend. She reported being more anxious lately and said her dad was in the hospital. "She said she feels like we need to increase her Klonopin. I reviewed her meds here and Dr. Piepergerdes had discontinued her Klonopin back in December. She said Dr. Boulware has continued her Klonopin prescription. We talked about the fact that Klonopin was best used for short-term because of its addictive qualities and

60

her problems with building up tolerance pretty quickly.  I told her she would need to talk to Dr. Boulware if she wants to have it increased.  She said she was seeing him this afternoon and indicated she plans to ask him to increase it."  Ms. Chance observed that plaintiff was pleasant and cooperative, alert and oriented.  Her thoughts were clear.  There was no apparent psychosis.  Her grooming and hygiene were good.  She maintained good eye contact.  Her affect was bright.  She denied having any thoughts of hurting herself or anyone else.  Ms. Chance continued plaintiff's Ability "for voices" and increased her Celexa to 40 mg a day "to see if that will help with her increased anxiety."

On March 22, 2011, plaintiff was seen at Northland Psychological Services for a counseling session (Tr. at 1324).  Plaintiff said she had fallen asleep driving and hit a median.  She therefore had started taking her Abilify at a different time of day.  Plaintiff had no homicidal or suicidal ideation.

On March 29, 2011, plaintiff was seen at Northland Psychological Services for a counseling session (Tr. at 1325).  Plaintiff was continuing to go to the community center to exercise.  Plaintiff had no suicidal or homicidal ideation.

On April 4, 2011, plaintiff was seen at Northland Psychological Services for a counseling session (Tr. at 1326).  Plaintiff's boyfriend and his daughter had moved into plaintiff's home.  Plaintiff had no suicidal or homicidal ideation.

On April 18, 2011, plaintiff was seen at Northland Psychological Services for a counseling session (Tr. at 1327).  Plaintiff said things were going well with her boyfriend and his daughter living in plaintiff's home.  She had no suicidal or homicidal ideation.

On May 6, 2011, plaintiff went to the emergency room at North Kansas City Hospital complaining of low back pain (Tr. at 1332-1346, 2394-2404).  She reported having fallen while walking up to her house, and she hit her back on a gas meter (Tr. at 2403).  Her

Case 4:13-cv-00438-REL   Document 17   Filed 09/22/14   Page 61 of 95

psychological exam was normal. Her extremities were normal with no tenderness, no edema, normal range of motion. She had muscle spasm and limited range of motion in her back. X-rays showed "either an acute nondisplaced fracture or an old healed fracture" of the 11th rib. She was treated with Oxycodone (narcotic pain reliever) and discharged with a prescription for Tylox (opioid pain reliever) with no refills (Tr. at 2396).

On May 18, 2011, plaintiff had x-rays of her left shoulder which showed mild degenerative spurring change (Tr. at 2389-2390).

On June 15, 2011, plaintiff saw Mary Chance at Tri-County Mental Health (Tr. at 1724, 1922-1923). Plaintiff said she had been more depressed lately, had "stopped going to therapeutic alternatives." Plaintiff said she continued to have trouble dealing with the death of her mom. Plaintiff was noted to be pleasant and cooperative, alert and oriented, with no apparent psychosis. Her grooming and hygiene were good. She maintained good eye contact. Her affect was flat. She denied having any thoughts of hurting herself or anyone else. She was assessed with depression and unresolved grief. Ms. Chance increased plaintiff's Celexa and told her to continue taking Abilify.

On June 16, 2011, plaintiff had an MRI of her left shoulder due to complaints of pain from a fall (Tr. at 2382). The MRI showed evidence of bone marrow edema/contusion (swelling/bruising) of the anterior aspect of the glenoid and posterior aspect of the humeral head[40] possibly related to direct trauma to these structures or possible previous episode of dislocation. The rotator cuff was intact.

---

40 

Case 4:13-cv-00438-REL   Document 17   Filed 09/22/14   Page 62 of 95

On July 13, 2011, plaintiff saw Mary Chance at Tri-County Mental Health (Tr. at 1725, 1921-1922). Plaintiff said she was doing better and the increased Celexa had helped a lot. Plaintiff reported that Dr. Boulware took her off all caffeine due to kidney problems and she was having a "hard time getting off of that because she had been drinking lots of caffeine every day." Plaintiff and her dad went to Illinois for the 4th of July to visit his family. "She said they had a nice time." Plaintiff reported being happy with her medications and said she did not think anything needed to be changed. Ms. Chance observed that plaintiff was pleasant and cooperative, alert and oriented. Her thoughts were clear, there was no apparent psychosis. Her grooming and hygiene were good. She maintained good eye contact. Her affect was bright. She denied thoughts of hurting herself or anyone else. "Client says she's doing well."

On July 23, 2011, plaintiff went to the emergency room at North Kansas City Hospital complaining of abdominal distention/bloating similar to when she previously had a small bowel obstruction (Tr. at 2339-2379). On exam her back was normal, her extremities were nontender with no edema, her psychological exam was normal. She was noted to be calm and alert while in the emergency room. She reported a history of depression but no other psychological history (Tr. at 2369). Plaintiff was admitted. Bilateral lower extremity venous doppler showed no evidence of blood clots in her legs. She was discharged on July 29, 2011, with a diagnosis of acute small bowel obstruction, resolved on medical therapy. Plaintiff's discharge medications did not include any opioids (Tr. at 2365).

On August 11, 2011, plaintiff contacted Dr. Boulware complaining of abdominal pain for the last three days (Tr. at 2270-2328). He directed her to go to the emergency room at North Kansas City Hospital. On exam her back was normal, her extremities were nontender with no pedal edema. Her psychological exam was normal. She was admitted with a suspected small bowel obstruction. Plaintiff was noted to be calm and cooperative. Dr.

Boulware treated her during her admission and noted that although the emergency room physician had assessed a bowel obstruction, "her abdominal series did not show a definite obstruction at that time." (Tr. at 2283). Plaintiff had an NG tube but was not having output through her Barnett continent Ileostomy. She was treated with medication and a subsequent pouchoscopy/ileoscopy was performed which showed no obstruction or strictures. Plaintiff was examined by Mangesh Oza, M.D., the general surgeon, and denied fatigue or malaise, denied shortness of breath, denied myositis or arthritis, denied paresthesias (Tr. at 2289). She was assessed with recurrent small bowel obstruction probably related to adhesions, and urinary tract infection secondary to E. coli. She was discharged on August 17, 2011, with recommendations to undergo a small bowel follow through. Plaintiff's prescribed medications before admission and at the time of discharge did not include any opioids although she was given IV Dilaudid at the hospital (Tr. at 2283-2284, 2286).

On August 23, 2011, plaintiff had a small bowel follow through which showed no bowel stenosis (narrowing) and a nodule in the distal ilium (Tr. at 2268).

On August 26, 2011, plaintiff saw Dr. Boulware to follow up on her lab work from her last visit (Tr. at 1988-1989). Plaintiff denied weakness, fatigue, difficulty sleeping, dizziness, headache, chest pain, shortness of breath, exercise intolerance, edema, leg cramps, all gastrointestinal symptoms, joint swelling, joint stiffness, muscle or joint pain, weakness of muscles or joints, back pain, change in memory, anxiety, nervousness, high stress, depression, agitation, irritability, and memory loss. The last three pages of this record are missing.

On September 28, 2011, plaintiff saw Mary Chance at Tri-County Mental Health (Tr. at 1726, 1921). Plaintiff described herself as "kind of a mess" because her birthday was coming up and she still missed her mother. "She said she hasn't been able to go to church because she would have to see an empty pew where her mother always sat." Plaintiff was observed to be

64

pleasant and cooperative, alert and oriented. Her thoughts were clear, there was no apparent psychosis. Her grooming and hygiene were good. She maintained good eye contact. Her affect was appropriate. She denied any thoughts of hurting herself or others. No medical changes were made. Grief support groups at local churches were discussed.

On September 29, 2011, plaintiff saw Mary Chance at Tri-County Mental Health for a medication check (Tr. at 1920). "She said she has been doing good. She said she started going back to church. She said she quit going to church when her mom died. . . . . She said she is looking forward to Thanksgiving. She says she has a new boyfriend and things are going good with him. She said she's been going to therapeutic alternatives. She said she enjoys that. She says she is not hearing any voices at all now." Plaintiff was observed to be pleasant and cooperative. She was alert and oriented. Her thoughts were clear. There was no psychosis. Her grooming and hygiene were good. She maintained good eye contact. Her affect was bright. She denied any thoughts of hurting herself or others. She was assessed with "schizoaffective disorder. Client said she's been doing good."

On October 6, 2011, plaintiff had a biopsy of the nodule discovered in her ileum during the small bowel follow through (Tr. at 2253-2265). The biopsy was negative.

On October 14, 2011, plaintiff went to the emergency room at North Kansas City Hospital and complained of swelling in her legs and feet for the past several weeks (Tr. at 2200-2252). She also complained of left shoulder pain and chest pain that started that day. When her symptoms were being reviewed, she was asked about psychiatric symptoms and she indicated she was having "some depression at the present time." No other psychiatric symptoms were reported. She was attended to by Dr. Boulware. Her psychological exam was normal. She reported some pain but was able to walk to the restroom (Tr. at 2208). She had not fallen in at least the last three months (Tr. at 2210). She had a CT pulmonary angiogram

65

that was negative for pulmonary emboli (blood clots in the lungs) (Tr. at 2211). She had a bilateral lower extremity venous Doppler study that was negative for deep vein thrombosis (blood clots in the legs) (Tr. at 2211). A nuclear imaging perfusion scan was performed that was negative for ischemia (decreased blood flow reducing the oxygen supply) (Tr. at 2211). Kent Barr, M.D., a cardiologist, was consulted. He observed that plaintiff was pleasant and in no acute distress. An echocardiogram was performed, the results of which were normal with an ejection fraction of 70% (Tr. at 2236). Chest x-rays were normal. His impression was "mild volume overload. Her lower extremity edema is likely multifactorial related to decreased physical activity and venous stasis [a slowing of blood flow in a vein]." (Tr. at 2221). Additional testing was done to rule out sleep apnea due to a 93% oxygen saturation level. Plaintiff was assessed with noncardiac chest pain and peripheral edema; shortness of breath and left shoulder pain of questionable etiology. She was prescribed Lasix, a diuretic, and discharged on a no-salt-added diet, activity as tolerated, no restrictions (Tr. at 2211-2212).

On October 24, 2011, plaintiff saw Dr. Boulware for a hospital follow up (Tr. at 1983-1987). Plaintiff denied weakness, fatigue, difficulty sleeping, dizziness, neck pain or stiffness, chest pain, shortness of breath, exercise intolerance, edema, weakness, leg cramps, all gastrointestinal symptoms, joint swelling, joint stiffness, muscle or joint pain, weakness of muscles and joints, back pain, tingling or numbness, anxiety, nervousness, high stress, depression, agitation, irritability, sleep problems and memory loss. "Patient is here to follow up on a recent visit to the emergency room. Pt states she has not had any problems since. Pt denies any other problems or concerns at this time." Plaintiff weighed 215 pounds. On exam plaintiff had normal range of motion, normal muscle strength and tone, normal gait and station, "digits unremarkable," no edema, normal sensation, normal peripheral pulses. She was alert and oriented times four, her mood and affect were appropriate, she had a normal

66

attention span, normal concentration, and she was in no acute distress. Dr. Boulware noted no abnormality at all during his examination. He assessed venous (peripheral) insufficiency, unspecified; left shoulder pain; constipation, unspecified; and anxiety state, unspecified. He ordered blood work. "Her left shoulder pain is much improved since being placed on Mobic and going off Ibuprofen [both non-steroidal anti-inflammatories]. Anxiety is well controlled on Clonazepam. Constipation is improved on Miralax." Her blood work showed decreased kidney function, so she was directed to decrease her Furosemide (diuretic) and decrease her potassium chloride (Furosemide can deplete potassium).

On October 27, 2011, the scheduling staff at Tri-County Mental Health Services wrote a letter to plaintiff noting that she had missed an appointment with Mary Chance on October 26, 2011 (Tr. at 1954).

As of November 6, 2011, plaintiff was found disabled by the ALJ after remand.

On April 22, 2012, Mary Chance completed a Mental Residual Functional Capacity Assessment finding that plaintiff's limitations as reflected in this document began more than ten years earlier (Tr. at 2506-2508). Ms. Chance found that plaintiff had no limitation in the following:

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to ask simple questions or request assistance

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

She found that plaintiff had a slight limitation in the following:

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to be aware of normal hazards and take appropriate precautions

67

She found that plaintiff was moderately limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to interact appropriately with the general public

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to respond appropriately to changes in the work setting

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

Ms. Chance did not make any assessment as to plaintiff's ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.

At the conclusion of the form, Ms. Chance wrote the following:

I have not talked with Mrs. White directly about her work history or ability to work now. She does have problems with anxiety. She is having a difficult time getting over her mother's death. She hears voices at times. She has a difficult time dealing with day to day problems at times.

68

## V.     FINDINGS OF THE ALJ

Administrative Law Judge Guy Taylor entered his opinion on August 20, 2012 (Tr. at 962-984).  He noted that plaintiff had filed another claim for Title II benefits on January 4, 2011, but the Appeals Council's action with respect to the current claim rendered the subsequent claim duplicate (Tr. at 964).  The ALJ found that plaintiff's last insured date was September 30, 2013 (Tr. at 967).

Step one.  Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 967).  Plaintiff worked after her alleged onset date; however, the ALJ characterized it as an unsuccessful work attempt (Tr. at 967).  Plaintiff's earnings record shows $848.40 for 2009 and $1,680.64 in 2010, but those earnings represent benefits paid by plaintiff's private insurance carrier (Tr. at 967).

Step two.  Since August 15, 2008, plaintiff has had the following severe impairments: major depressive disorder, generalized anxiety disorder with agoraphobia, schizoaffective disorder, ileostomy with mild pouchitis,[41] bursitis/tear of the left shoulder, mild trochanteric bursitis in the right hip, degenerative disc disease of the cervical and lumbar spine, cervical spondylosis, neuropathy involving the right median nerve, bilateral sacroiliitis, peripheral neuropathy of the bilateral lower extremities, ulcerative colitis, post ileostomy and colectomy

---

[41] "Many people with serious ulcerative colitis end up having their diseased colon removed and the bowel reconnected with a surgical procedure known as ileoanal anastomosis (IPAA) . This surgery creates an internal pouch (from the small intestine) to hold waste before it's eliminated. Pouchitis is an inflammation of the lining of this pouch. This complication occurs in up to half of people who have this operation. They experience symptoms such as abdominal pain, cramps, increased number of bowel movements and a strong feeling of the need to have a bowel movement."
http://www.mayoclinic.org/diseases-conditions/pouchitis/basics/definition/con-20036404
I note that on March 3, 2009, during pre-surgery review, plaintiff denied pouchitis (Tr. at 481).

Case 4:13-cv-00438-REL   Document 17   Filed 09/22/14   Page 69 of 95

with intermittent small bowel obstruction complications, obesity, and fibromyalgia (Tr. at 968).

The following are nonsevere impairments: gastroesophageal reflux disease, hypertension, diabetes mellitus, acute renal failure with urosepsis, edema/gout, allergies, and status post left ankle fracture (Tr. at 638).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 968-969).

Step four. Plaintiff retains the residual functional capacity to perform sedentary work except that she would need the option to sit or stand at will without otherwise materially adversely affecting her ability to do the job; she could never climb ladders, scaffolding or ropes; never crouch, crawl, or kneel; occasionally climb stairs, balance or stoop; frequently handle and finger with her right upper extremity; do only simple unskilled work with an SVP of 2 or less; have limited contact with the general public; and must be able to elevate one foot or the other periodically through the day as much as 18 inches (Tr. at 969). With this residual functional capacity, plaintiff is unable to perform any of her past relevant work as accounting clerk, receptionist, or file clerk (Tr. at 981).

Step five. Prior to November 6, 2011, plaintiff was a "younger individual age 45-49." (Tr. at 981). On November 6, 2011, plaintiff's age category changed to an individual closely approaching advanced age (Tr. at 981). Prior to November 6, 2011, plaintiff was capable of making an adjustment to other work available in significant numbers (Tr. at 982-983). Given plaintiff's age, education, work experience, and residual functional capacity, she was capable of working as a document preparer or an addresser, both available in significant numbers (Tr. at 982).

Beginning on November 6, 2011, the date plaintiff's age category changed, there are no jobs that exist in significant numbers in the national economy that plaintiff could perform (Tr. at 983).

## VI.    CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible. Plaintiff argues that the ALJ erroneously based his finding on his conclusion that "some" of plaintiff's allegations were unsupported by the objective medical evidence and on the eviction notice used to get a dire-need expedited hearing.  She also takes exception with the ALJ's finding that there is no medical evidence that plaintiff needs to take 3-hour naps, and argues that the ALJ failed to assess most of the credibility factors.

## A.    CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions.  Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence.  Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ.  In determining

71

credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The ALJ's credibility analysis spans 11 pages, single spaced, and I will not repeat it here. I find, for the following reasons, that the ALJ adequately discussed plaintiff's credibility and provided sufficient reasons for why he found her testimony not entirely credible.

## 1.     PRIOR WORK RECORD

Plaintiff's work record shows that she worked for many years after her total proctocolectomy with ileostomy.  From 2000 through her alleged onset date, she earned anywhere from $23,000 to $32,000 per year, despite having the intestinal reservoir that requires periodic emptying during the day and caused periodic small bowel obstruction. Although a good steady work record, which plaintiff has, normally would suggest that her impairments are the cause of her not working as opposed to some other motivation, in this case the record also establishes that after plaintiff stopped working, she was the primary care giver to her elderly parents whose health was failing, which provides a separate motivation for her decision to stop working after Dr. Boulware released her to return to work.  Plaintiff reported

72

that she cared for her elderly parents when she completed a Function Report, and her medical records contain numerous references to plaintiff's providing the primary care to her parents. The records (as well as plaintiff's testimony) also establish that plaintiff was very unhappy with the change in duties at a job that she had held for 11 years, which also occurred at the time she took over caring for her parents and decided not to return to work.

## 2.    DAILY ACTIVITIES

Plaintiff testified that she does not help her elderly father around the house, she does no housework at all, and she does very little cooking. Her father was doing the heavy lifting around the house and taking care of plaintiff's dog for her. Plaintiff's medical records do not substantiate this testimony. On October 15, 2008, plaintiff told Jennifer Salmons, LPC, that her parents' health was failing and she was helping to care for them. On November 1, 2010, plaintiff was seen at Tri-County Mental Health and said she was caring for her mother who had stage 4 brain cancer, and her siblings were not helping her. On November 10, 2010, plaintiff told Mary Chance that plaintiff was her parents' primary care giver and they were in poor health. On November 16, 2010, plaintiff was seen at Northland Psychological Services and talked about the stress of caring for her parents. Later that month she told Dr. Jaffri that she was taking care of her elderly parents who were both sick.

In March 2009 during a review of systems in a Florida hospital before her hysterectomy, she reported being active.

On April 28, 2009, plaintiff told a DDS worker that she was "doing laundry and going up and down stairs. . . . She still cares for her parents and her mother is having her 17th radiation treatment". Plaintiff was able to do laundry, do dishes, and make sandwiches and breakfast. In a Function Report, plaintiff reported that she takes her daughter to work and picks her up every day, she cleans the kitchen, loads and unloads the dishwasher, and is able to

73

shop for groceries in stores for a half an hour once a week.

Plaintiff testified that she has trouble being around people which results in agoraphobia. Again, the medical records contradict this testimony. On October 31, 2008, plaintiff injured her ankle while at a friend's house. Plaintiff's medical records show that in August 2009 she sang in church. She told Ms. Chance that she had not been able to go to church after her mother's death because it was too sad to see the empty seat where her mother used to sit, not because of any impairment. Later that month she reported that she had started attending church services again. Plaintiff told a counselor that she had taken her mother to a historical organization meeting. On November 10, 2010, plaintiff said she enjoyed going to the Lakeside Nature Center. On February 28, 2011, plaintiff told her counselor she had recently joined a community center. She also said that three weeks earlier she met a new boyfriend. On March 9, 2011, plaintiff told her counselor she was continuing to go the community center for exercise and that things were going well with her new boyfriend. On March 22, 2011, plaintiff told her counselor she had wrecked her car, so she was clearly still driving. At the end of March plaintiff reported continuing to go to the community center for exercise. Plaintiff told Mary Chance that she and her dad had gone to Illinois to visit his family over the 4th of July, again indicating that plaintiff can drive long distances and visit with people. I also point out that despite all this evidence, the ALJ found that plaintiff's severe impairments included generalized anxiety disorder "with agoraphobia" despite there being nothing other than plaintiff's testimony to suggest this impairment.

## 3. *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS*

Plaintiff testified on November 19, 2009, that her pain is in her lower back, her middle back, her neck and her right leg. She described the pain in her lower back during the hearing as an 8 out of 10, the pain in her middle back was a 5 out of 10, the pain in her neck was an 8

or a 9 out of 10, and the pain in her leg was a 6 out of 10 when sitting and a 3 or 4 out of 10 when she stands. Yet despite this almost unbearable pain, the only medication she had been prescribed for her pain during the relevant period is Meloxicam, a mild non-steroidal anti-inflammatory. Clearly plaintiff's treating doctors do not believe that her pain is as bad as she claimed during the hearing.

Comparing this November 9, 2009, testimony about her excruciating pain to the medical record of that same month, a discrepancy is apparent. On November 13, 2009 -- six days before plaintiff's testimony -- she saw Dr. Boulware. On that day her psychological exam was normal. Her physical exam was normal. Dr. Boulware diagnosed fibromyalgia, sinus tarsi syndrome, ankle arthritis secondary to severe strain, and major depressive disorder. He increased her Fluoxetine (antidepressant) since Lyrica was not covered by her insurance, and he administered a steroid/Lidocaine injection to her left ankle.

On November 25, 2009 -- six days after her testimony -- plaintiff saw Dr. Boulware. Her psychological exam was normal. Her physical exam was normal. Dr. Boulware assessed fibromyalgia and degenerative joint disease. He ordered blood work and refilled plaintiff's Savella (treats fibromyalgia) with one year of refills. Despite testifying that her body pain is almost unbearable, plaintiff did not report that pain to Dr. Boulware and did not seek any other medical treatment for this pain which suggests that the non-steroidal anti-inflammatory and the one steroid/Lidocaine injection adequately controlled her pain that month.

With regard to her back pain, on April 14, 2009, plaintiff told a home health nurse that her pain level was "none." On April 21, 2009, plaintiff said her pain level was "none." On April 23, 2009, her pain level was "none." This was eight months after her alleged onset date.

As to her neck pain, plaintiff first reported neck pain that "comes and goes" on July 30, 2009 -- nearly a year after her alleged onset date. She said it only started about a month

75

earlier.

With regard to plaintiff's numb fingers, on January 14, 2010, plaintiff told Dr. Boulware that about a month ago she had started experiencing numbness in the fingers on her right hand. This was a year and five months after her alleged onset date. Her nerve conduction studies done that same day were entirely normal.

As to her memory, on November 19, 2009, plaintiff testified that she has had memory problems since her alleged onset date. However, in January of 2009 (which is after her alleged onset date) plaintiff completed a Function Report wherein she reported that her impairments do not affect her memory. In May of 2009 (nine months after her alleged onset date) plaintiff completed a Function Report wherein she stated that her impairments do not affect her memory.

Plaintiff testified at the second hearing that she has memory problems and that her doctors think her memory impairment is caused by her medications. On October 15, 2008, Jennifer Salmons, LPC, noted that plaintiff's memory was intact. On June 24, 2009, she saw Kenneth Luther for counseling and denied memory problems. During the entire second half of 2009 plaintiff participated in counseling with Mr. Luther and never mentioned memory problems. On November 1, 2010, plaintiff was evaluated at Tri-County Mental Health and her memory was noted to be intact. In November 2010 during her involuntarily hospitalization, her memory was noted to be mildly impaired. On August 26, 2011, she saw Dr. Boulware and denied memory loss. On October 24, 2011, she saw Dr. Boulware and denied memory loss. Even the Mental Residual Functional Capacity Assessment of Mary Chance that plaintiff urges the court to accept indicates that plaintiff has "no limitation" in her ability to remember very short and simple instructions. And finally, I point out that the ALJ restricted plaintiff to unskilled work with an SVP of 2 or less "due to her loss of short term memory", even though

76

the **only** medical evidence of any memory impairment is a one-time observation that plaintiff's memory was mildly impaired on a day when she was complaining that she had been "duped" and wound up in the hospital against her wishes.

With regard to hearing voices, plaintiff testified on August 13, 2012, that she hears voices two or three times a week and they last all day. During the more than three-year period at issue here, the following is established with respect to plaintiff's hearing voices. She did not report hearing any voices at any time in 2009, to any physician, any psychiatrist, any psychologist, any nurse, any counselor or therapist. The first time she reported hearing voices was on November 1, 2010, when she was evaluated by Mary Chance, a nurse at Tri-County Mental Health. On that day, plaintiff claimed to have at least five different alternate personalities. She called them alternate personalities and "voices," using the terms synonymously. On that day she also mentioned that an exam was coming up to assign her a GAF score to see if she continued to qualify for Medicaid. On November 10, 2010, she told Mary Chance again that she hears 5 different voices "most of the time." She said the voices started "just this last year" and she had named them all. On November 16, 2010, someone from Ms. Chance's office talked to plaintiff on the telephone. Plaintiff said that her good voices were trying to compromise with her bad voice, Ian, to keep her alive. The following day she had a counseling session at Northland Psychological Services and said that last year she started hearing voices. She said they speak clearly to her and she thinks that they are parts of herself except for one which is a demon. Plaintiff said that there was one part of her that speaks to her that is named "Emily" who is "5 years old with long blonde hair." It was never determined how a "voice" could have long blonde hair. Plaintiff said that "Emily" would sing to her at night. The following day, she had an appointment with Dr. Piepergerdes, a psychiatrist at Tri-County Mental Health. She said she had a demon named Ian and five other named voices, one

of whom had told her that morning to change her bra to match her shirt. Dr. Piepergerdes had plaintiff admitted, initially against her will, due to her threats against her brother and sister.

While at St. Luke's, Dr. Jaffri, a psychiatrist, noted that plaintiff said she heard voices but did not provide much detail. He wrote that plaintiff was "not a good historian and not a reliable person. . . . She reports [elsewhere] having multiple personalities but she did not report to this writer. The patient was kind of vague and evasive about her symptoms."

On December 1, 2010, after plaintiff had been discharged, she was seen at Northland Psychological services and said she continued to hear voices. She "talked about how 'Peter', her comic relief, has been telling her jokes today." Seven days later she saw Dr. Piepergerdes and said she was no longer hearing any voices. She did not mention to this psychiatrist that "Peter" had told her jokes a week earlier. On January 14, 2011, plaintiff again saw Dr. Piepergerdes and denied hearing voices. On February 14, 2011, plaintiff saw Mary Chance and said she sometimes hears voices. Her Abilify was increased. On March 9, 2011, she told Ms. Chance she was no longer hearing voices. By September 29, 2011, she was still not hearing voices.

Therefore, the medical records establish that plaintiff first complained of hearing voices on November 1, 2010, and last reported hearing voices on February 14, 2011.

## 4. *PRECIPITATING AND AGGRAVATING FACTORS*

The medical records establish that being the primary care giver to her sick and elderly parents was a primary precipitating and aggravating factor as far as plaintiff's anxiety. After her mother, who had been suffering from cancer, passed away, plaintiff continued to deal with grief issues but was able to join a community center, meet a new boyfriend who moved in with her, resume church attendance, take her father on a trip out of state.

78

## 5.    DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

On November 19, 2009, plaintiff testified that she thinks her anti-depressant and anti-anxiety medication helps her symptoms, but not always and not fully.

She testified that she had "fits of rage"on Savella and was therefore switched to Lyrica. The medical records, however, show that on July 30, 2009, plaintiff told Dr. Boulware that she was "doing great on Savella." On November 25, 2009 -- six days after plaintiff's testimony -- Dr. Boulware refilled plaintiff's Savella for one year. There is no evidence that plaintiff ever experienced any problems at all on Savella much less "fits of rage."

Plaintiff testified in August 2012 that Abilify and Celexa help with her mental symptoms. In early 2011 medical records show that Abilify stopped the voices plaintiff claimed to have been hearing.

Plaintiff testified that besides memory problems (discussed above) she has no other adverse side effects from her medication.

## 6.    FUNCTIONAL RESTRICTIONS

During the first hearing plaintiff testified that she could walk a block at the most. However, in January 2009 -- after her alleged onset date -- plaintiff completed a Function Report wherein she stated that she was able to walk a mile before needing to rest for five minutes.

Plaintiff testified that she could only sit for 5 or 6 minutes at a time. However, in January of 2009, after her alleged onset date, plaintiff completed a Function Report wherein she stated that her impairments do not affect her ability to sit. In May of 2009, nine months after her alleged onset date, plaintiff completed a second Function Report wherein she stated that her impairments do not affect her ability to sit.

Plaintiff testified that she could stand for 5 minutes at a time. However, in January 2009, after plaintiff's alleged onset date, she completed a Function Report wherein she stated that her impairments do not limit her ability to stand.

Plaintiff testified that she drops things when she tries to pick them up in her right hand and she can only use her right hand for two or three minutes at a time before needing to rest her hand for an hour. However, in January of 2009, after plaintiff's alleged onset date, she completed a Function Report wherein she stated that her impairments do not limit her ability to use her hands. In May of 2009, nine months after her alleged onset date, plaintiff completed a second Function Report wherein she stated that her impairments do not limit her ability to use her hands.

Plaintiff testified during the second hearing that she was diagnosed in 2010 with carpal tunnel syndrome. However, no medical records show a diagnosis of carpal tunnel syndrome. On January 14, 2010, nerve conduction studies of both upper extremities were entirely normal.

On December 12, 2008 -- three months after plaintiff's alleged onset date -- Dr. Boulware found that in a normal day plaintiff could stand and walk for 1 to 4 hours secondary to her injured ankle which was a temporary condition; she could sit for 5 to 10 hours; she could drive for 5 to 10 hours; she could do simple and firm grasping with both hands; she could perform fine manipulation with both hands; she could bend 67 to 100% of the time; she could climb 34 to 66% of the time; she could twist her body, push, pull, grasp or reach 67 to 100% of the time; she could crawl up to 33% of the time; and she could never squat, balance (due to the fracture in her ankle) or kneel. "Can employee work an 8 hour day with the above restrictions?" Dr. Boulware answered, "yes."

On December 29, 2009, Michael Farber, M.D., reviewed plaintiff's medical records and found that plaintiff should be permanently restricted to lifting 20 pounds occasionally and up to 10 pounds frequently. She should be able to sit or stand provided she has the ability to change positions occasionally for comfort. "She would be able to work full time."

On January 19, 2010, Richard Kaplan, M.D., board certified in pain management, reviewed plaintiff's medical records and estimated that plaintiff could stand or walk one to four hours per day, should do no squatting, balancing or kneeling, and could lift up to 15 pounds.

I find that the Polaski factors clearly support the ALJ's credibility conclusion.

## B. CREDIBILITY CONCLUSION

In addition to her complaint that the Polaski factors, discussed above, do not support the ALJ's credibility conclusion, plaintiff argues that the ALJ's reasoning that only "some" of plaintiff's testimony is not supported by the medical records is erroneous.

Plaintiff testified on November 19, 2009, that one of the fingers on her hand is "dead" due to bone spurs pinching off a nerve in her neck. She testified that this was confirmed by EMG 8 years earlier, which was about 7 years before her alleged onset date, meaning she was able to work for many years despite this allegedly "dead" finger. However, on August 14, 2009 -- the month before her testimony -- plaintiff had x-rays and an MRI of her cervical spine which showed no nerve pinching in her neck. On January 14, 2010, which is two months after her testimony, she saw Dr. Boulware and, for the first time in this 2,500 page record, told him that the fingers in her right hand had been going numb for about one month, or December 2009, the month after she testified that she had been experiencing this for at least 8 years. Nerve conduction studies for both arms in January 2010 were entirely normal. There is no other evidence of plaintiff complaining to any doctor about her finger being dead or

81

numb.

Plaintiff testified on August 13, 2012, that she had bladder problems; however, three months later she would undergo a urodynamic evaluation the results of which were "large capacity bladder with normal bladder function" and "no evidence for intrinsic sphincter deficiency."

Plaintiff testified and reported to doctors that she had a nervous breakdown during her hospitalization in August 2008 -- her alleged onset of disability. However, those records show that she was on the same dose of anti-anxiety medication before she was hospitalized and at the time of her discharge. The hospitalization was due to a small bowel obstruction. While there, plaintiff was noted to have experienced "generalized anxiety" due to heavy menstrual periods. She was described as pleasant by Gregory Mulcahy, M.D. She was observed by Brian Wittek, M.D., to be resting comfortably in no acute distress. The day after her admission plaintiff underwent a limited small bowel follow through. During this exam she was in a supine position while a contrast medium was inserted through her nasogastric tube (a tube passing through the nose, the nasopharynx and esophagus into the stomach) causing her stomach contents to back up into her esophagus. Plaintiff had a panic attack during this test and it was completed with her in a standing position rather than lying supine. At the conclusion of that test plaintiff was in stable condition, and there is no indication that anti-anxiety medication was required. There is no other mention of anxiety or any other mental symptoms or complaints anywhere in the records of this 8-day hospitalization. There are no medical records of plaintiff ever having suffered a "nervous breakdown."

Plaintiff testified on August 13, 2012, that she was diagnosed in 2010 with carpal tunnel syndrome. However, no medical records show a diagnosis of carpal tunnel syndrome. On January 14, 2010, nerve conduction studies of both upper extremities were entirely

82

normal.

There are additional inconsistencies in the medical records. For example, on March 26, 2009, the day after she was released from the hospital, plaintiff told a home health nurse that she had had "seizure like convulsions" after being given phenergan in the hospital. There is no reference anywhere in the hospital records of plaintiff having such a reaction to phenergan. The record is full of examples of the medical records contradicting plaintiff's testimony. The fact that only "some" of plaintiff's testimony is contradicted by the medical records does not support a finding that the ALJ erred in his credibility determination.

Plaintiff argues that the ALJ erred in relying on plaintiff's use of what the ALJ found to be a fraudulent eviction notice in order to move her case before approximately 8,000 other cases awaiting disposition. Plaintiff reasons that because she eventually did move out of that house and into her father's home, there is evidence that the eviction notice was real. This is not persuasive.

On September 12, 2009, plaintiff completed an Activities of Daily Living questionnaire in which she reported that she had lived at her current address for three years. When asked "Do you plan to move in the near future?" plaintiff responded, "No" despite having received an eviction notice about three months earlier which she used to expedite her disability case under the "dire need" provision. Clearly plaintiff had no fear of being evicted by her life-long friend/landlord and, per plaintiff's testimony, her daughter continued to pay at least half the rent each month. The ALJ properly relied on this fact; however, even without it, the substantial evidence in the record supports the ALJ's credibility finding.

Finally, plaintiff offers medical reasons such as a B12 deficiency, fibromyalgia, and obesity, as impairments which can cause someone to need to take three-hour naps and therefore the ALJ erred in discrediting this testimony.

A review of the medical records, however, fails to support this. In March 2009 while plaintiff was hospitalized in Florida for a hysterectomy, she denied experiencing fatigue. On October 11, 2010, she told Dr. Boulware that she wants to sleep a lot. But during her August 2011 hospitalization, she denied fatigue or malaise. On August 26, 2011, she saw Dr. Boulware and denied fatigue. On October 24, 2011, she saw Dr. Boulware and denied fatigue. In no medical record during this three-year period did plaintiff ever complain of fatigue or the need to nap. Plaintiff's suggestion of different medical reasons that may cause her fatigue and need to nap is not persuasive because the issue is not **why** plaintiff could possibly need to nap, it is **whether** there is a physical or mental impairment or medication side effect that causes her to nap for three hours at a time during working hours. The record establishes that there is not.

I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's testimony is not entirely credible.

## VII.    TREATING PHYSICIANS' OPINIONS

Plaintiff argues that the ALJ erred in giving little weight to the opinions of Dr. Boulware and Adult Psychiatric-Mental Health Clinical Nurse Specialist Mary Case and instead giving significant weight to the opinions of Dr. Allen and Dr. Altomari who did not examine plaintiff or review all the pertinent evidence.

Plaintiff argues that the ALJ was required to re-contact Dr. Boulware for an explanation since the evidence did not support Dr. Boulware's opinion. However, plaintiff does not identify in her brief what functional limitations Dr. Boulware believes should be in place but were not adopted by the ALJ. In fact, I had to go to the ALJ's opinion to see exactly which opinion plaintiff believes was wrongfully discredited since that is not identified in plaintiff's brief.

The ALJ gave little weight to the "treating source medical source statement (MSS) signed by Dr. Boulware on October 10, 2009 (Exhibit 31F)." (Tr. at 980). Dr. Boulware's

84

October 10, 2009, opinion, found at pages 945 and 948 of the administrative transcript, is a letter to whom it may concern which reads as follows:

> This is a 47 year old patient of mine who has chronic intractable pain with cervical spondylosis that she rates that pain 9 on a 1-10 scale. Low back pain is also present which she rates a 7 out of 10 pain scale. She continues to have pain over the area of fracture. She has had a history of ulcerative colitis that was treated with Barnett Continent Ileostomy but unfortunately this has caused recurrent problems with bowel obstruction.
>
> She most recently had a prolonged illness for which she was hospitalized first in Florida, and later in North Kansas City Hospital for hysterectomy followed by complications of acute renal failure with her creatinine going 9.8. She had urosepsis, prolonged pelvic abscess. She has also had a history of pulmonary emboli, deep venous thrombosis, type 2 diabetes mellitus, generalized anxiety, and a major depression.
>
> She has tried through the years to work at various jobs but has had difficulty with her employers understanding she has periods of time when she has to be absent for prolonged periods of time for health reasons. It is my opinion she has gotten to the point where she is chronically disabled from a number of medical problems as described above. I do support her claim of disability.

In this letter, Dr. Boulware does not describe any functional limitation at all. His opinion that plaintiff is disabled deserves no deference because it invades the province of the Commissioner to make the ultimate disability determination. House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007). His description of plaintiff's reports of her pain level has already been discussed above and will not be repeated here. Suffice it to say, if Dr. Boulware believed plaintiff's pain was truly as bad as she claimed, it is implausible that he would have treated her with nothing more than non-steroidal anti-inflammatories and steroid/Lidocaine injections. Although he routinely referred to her specialists for other issues, he never referred her to a pain management specialist and during the time period at issue here did not prescribe narcotic pain medication for her "chronic intractable" low back and neck pain.

A good portion of Dr. Boulware's letter simply lists her impairments. However, the ulcerative colitis that was treated with Barnett Continent Ileostomy all occurred many years before plaintiff's alleged onset date. The illness for which she was hospitalized first in Florida,

85

and later in North Kansas City Hospital was a hysterectomy which is not related to job functions and is obviously a one-time event. He noted that plaintiff has had a history of pulmonary emboli and deep venous thrombosis; however, clearly this occurred prior to her alleged onset date because every test for pulmonary emboli and deep venous thrombosis in this record was negative. Her type 2 diabetes mellitus is controlled by diet and plaintiff testified she has no symptoms from it.

Additionally, when this letter is compared to Dr. Boulware's other records regarding plaintiff's functional abilities and her attempt to secure disability benefits, it is clear that he believed during the relevant period that she could work and that he attempted to assist her with her non-work-related pursuits.

On November 8, 2008, Dr. Boulware wrote, "Having problems @ work so went back on FMLA. They are wanting her to learn a different job." He continued her off work "for both acute physical and psychiatric problems." Dr. Boulware did not observe any psychiatric problems, he did not list any complaints of psychiatric problems, he did not diagnose any specific psychiatric problems during that visit.

About five weeks later, on December 12, 2008, Dr. Boulware found that in a normal day plaintiff could stand and walk for 1 to 4 hours secondary to her injured ankle; she could sit for 5 to 10 hours; she could drive for 5 to 10 hours; she could do simple and firm grasping with both hands; she could perform fine manipulation with both hands; she could bend 67 to 100% of the time; she could climb 34 to 66% of the time; she could twist her body, push, pull, grasp or reach 67 to 100% of the time; she could crawl up to 33% of the time; and she could never squat, balance (due to fracture in ankle) or kneel. "Can employee work an 8 hour day with the above restrictions?" Dr. Boulware answered, "yes." He concluded with, "Pt can work if environment not severely stressful." No other mention of "psychiatric problems" appears in

86

this form, despite Dr. Boulware's notation on November 4, 2008, that plaintiff at that time should "continue off work for both acute physical and psychiatric problems." Therefore, one can assume that whatever psychiatric problems were keeping plaintiff from working less than two months earlier had resolved by this day.

On December 29, 2008, Dr. Boulware wrote, "Filled out a disability paper in depth **with patient's assistance**." (emphasis added). On January 12, 2011, Dr. Boulware wrote, "Filled out a functional test **with the help of the patient** on what the patient can and cannot do with the patient's present limitations." (emphasis added). Since Dr. Boulware made it clear on several other occasions that plaintiff assisted him with her disability paperwork, it is reasonable to conclude that she also helped him with this one, especially since it does nothing more than say that she is unable to work.

Because it was not error for the ALJ to discount a letter from plaintiff's treating doctor (who actually had released her to return to work shortly after her alleged onset date) which does not discuss any functional limitations, this argument is without merit.

Plaintiff also argues that the ALJ erred in giving little weight to the opinion of Adult Psychiatric-Mental Health Clinical Nurse Specialist Mary Case on the ground that the ALJ relied solely on GAF scores in the treatment records to discredit the opinion but the GAF scores are actually consistent with the opinion.

The opinion of Mary Chance appears in an April 22, 2012, Mental Residual Functional Capacity Assessment finding that plaintiff's limitations began more than ten years earlier. Ms. Chance found that plaintiff had no limitation in the following:

- The ability to understand and remember very short and simple instructions
- The ability to carry out very short and simple instructions
- The ability to ask simple questions or request assistance

87

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

She found that plaintiff had a slight limitation in the following:

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to be aware of normal hazards and take appropriate precautions

She found that plaintiff was moderately limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to interact appropriately with the general public

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to respond appropriately to changes in the work setting

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

Ms. Chance did not make any assessment as to plaintiff's ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.

At the conclusion of the form, Ms. Chance wrote the following:

88

I have not talked with Mrs. White directly about her work history or ability to work now. She does have problems with anxiety. She is having a difficult time getting over her mother's death. She hears voices at times. She has a difficult time dealing with day to day problems at times.

Ms. Chance, a nurse, falls into the category of "other sources." 20 C.F.R. §§ 404.1513(d), 416.913(d). "Information from these 'other sources' cannot establish the existence of a medically determinable impairment," according to SSR 06-3p. Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007). "Instead, there must be evidence from an 'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." Id. quoting SSR 06-3p.

In general, according to the ruling, the factors for considering opinion evidence include:

- How long the source has known and how frequently the source has seen the individual;

- How consistent the opinion is with other evidence;

- The degree to which the source presents relevant evidence to support an opinion;

- How well the source explains the opinion;

- Whether the source has a specialty or area of expertise related to the individual's impairment(s); and

- Any other factors that tend to support or refute the opinion.

Ms. Chance is a mental health specialist and treated plaintiff for several years. She did not in this opinion provide any relevant evidence to support her opinion. Plaintiff's grief issues began well after her alleged onset date and are not prevalent in plaintiff's psychiatric treatment records. Plaintiff reported hearing voices for a 3 1/2 month period and her final report of hearing voices was well before Ms. Chance rendered this opinion.

89

The overwhelming factor in this analysis is the consistency (or rather, inconsistency) of Ms. Chance's opinion in this document with the other evidence.

On January 23, 2009, at North Kansas City Hospital, plaintiff's psychological exam was normal. On January 26, 2009, consulting psychologist Keith Allen, Ph.D., found that plaintiff had no restriction of activities of daily living; mild difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence or pace. On April 3, 2009, plaintiff saw Dr. Boulware and no complaints of mental health problems were noted. He made no observations of mental health concerns, and no mental health diagnoses were made. On April 17, 2009, plaintiff saw Dr. Boulware and no complaints of mental health problems, observations of mental health concerns, or mental health diagnoses were made. On April 29, 2009, Mark Altomari, Ph.D., completed a Psychiatric Review Technique finding that plaintiff suffers from no restriction of activities of daily living; mild difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence or pace. On April 30, 2009, Dr. Boulware noted that plaintiff's psychological exam was normal. On June 1, 2009, Dr. Boulware noted that plaintiff's psychological exam was normal. On June 15, 2009, Dr. Boulware noted that plaintiff's psychological exam was normal. On July 16, 2009, Dr. Boulware noted that plaintiff's psychological exam was normal. On July 30, 2009, Dr. Boulware noted that plaintiff's psychological exam was normal. On August 11, 2009, Dr. Boulware noted that plaintiff's psychological exam was normal. On August 28, 2009, Dr. Boulware noted that plaintiff's psychological exam was normal with depression not present. On November 13, 2009, Dr. Boulware noted that plaintiff's psychological exam was normal. On November 25, 2009, Dr. Boulware noted that plaintiff's psychological exam was normal. On December 22, 2009, Dr. Boulware noted that plaintiff's psychological exam was normal.

On December 30, 2009, Thomas Gratzer, M.D., a forensic psychiatrist, reviewed plaintiff's medical records and found that plaintiff was not psychiatrically impaired, limited or restricted. On February 3, 2010, plaintiff's psychological exam at North Kansas City Hospital was normal. In March 2010, plaintiff was hospitalized for dehydration and none of her 13 discharge diagnoses were related to any mental impairment. At no time during her five-day stay did plaintiff complain of any mental symptoms and none were observed by anyone who treated her. On April 15, 2010, Dr. Boulware noted that plaintiff's psychological exam was normal. On May 17, 2010, plaintiff told Dr. Boulware she was under increased stress because her father had broken his hip. Dr. Boulware assessed major depressive disorder with generalized anxiety and kept plaintiff on the same dose of the same antidepressant and the same dose of the same anti-anxiety medication despite her complaints of increased stress.

On June 17, 2010, Dr. Boulware noted that plaintiff's psychological exam was normal. On June 28, 2010, plaintiff's psychological exam at North Kansas City Hospital was normal. On July 2, 2010, Dr. Boulware noted that plaintiff's psychological exam was normal. On July 19, 2010, plaintiff's psychological exam at North Kansas City Hospital was normal. On July 27, 2010, Dr. Boulware noted that plaintiff's psychological exam was normal. On August 24, 2010, Dr. Boulware noted that plaintiff's psychological exam was normal. On August 30, 2010, Dr. Boulware noted that plaintiff's psychological exam was normal. On September 13, 2010, Dr. Boulware noted that plaintiff's psychological exam was normal. On October 11, 2010, Dr. Boulware noted that plaintiff's psychological exam was normal.

On November 1, 2010, a mental status exam was performed and plaintiff was observed to be appropriately dressed, cooperative, with normal motor activity, good alertness, intact orientation, excessive speech, blunted affect. She had good concentration, intact thought content, average intellect. Her memory was intact, her attention was good. Her GAF was 60.

This was despite her, for the first time, reporting hearing voices of at least five identifiable men and women whom she also referred to as her alternate personalities. She also mentioned during this visit that she was stressed about her disability case. Two weeks earlier the Appeals Council had denied her request for review.

On November 3, 2010, someone from Tri-County Mental Health called plaintiff and then noted that she seemed cheerful and appeared to be in a pleasant mood. On November 10, 2010, plaintiff had a psychological evaluation done by Ms. Chance. Plaintiff again said that she was stressed over her disability case.

On November 16, 2010, plaintiff was called by Tri-County Mental Health and said her "good" voices were trying to compromise with her "bad" voice, Ian, to save her life. Later that day she was seen for a counseling session at Northland Psychological Services and described one voice as "blonde."

On November 17, 2010, plaintiff was "duped" into seeing Dr. Piepergerdes who informed her she would be hospitalized for making threats to kill her siblings. Plaintiff said she had just been frustrated at having to care for her elderly parents without help from her siblings and did not mean it. When she was treated there by Dr. Jaffri she was very vague about her "voices" or "alternate personalities." When Dr. Jaffri believed plaintiff was ready to be discharged, she refused to go home.

On December 8, 2010, Dr. Piepergerdes observed that plaintiff was cooperative and casually dressed with good grooming and hygiene. Eye contact was good, speech was normal. Thought processes were clear. Affect was level. On December 27, 2010, Dr. Boulware noted that plaintiff's psychological exam was normal. On January 14, 2011, plaintiff told Dr. Piepergerdes that she was doing reasonably well, her mood was generally good, she was having no suicidal or homicidal ideation, and she was not hearing voices. He observed her to

92

be cooperative and dressed casually with good grooming and hygiene. She made good eye contact. Her speech was normal, her thought processes were clear, her affect was level.

On January 17, 2011, plaintiff's psychological exam at North Kansas City Hospital was normal. On January 24, 2011, Dr. Boulware noted that plaintiff's psychological exam was normal. On March 9, 2011, plaintiff told her counselor she was going to a community center to exercise and things were going well with her new boyfriend. The counselor commented on plaintiff's positive attitude and remarked that plaintiff seemed happy. On May 6, 2011, plaintiff's psychological exam at North Kansas City Hospital was normal. On July 23, 2011, her psychological exam at North Kansas City Hospital was normal. She was observed to be calm and alert, and in her medical history she reported no mental health history other than depression. On August 11, 2011, her psychological exam at North Kansas City Hospital was normal.

On August 26, 2011, plaintiff saw Dr. Boulware and denied anxiety, nervousness, high stress, depression, agitation, irritability, and memory loss. On October 14, 2011, plaintiff was seen at North Kansas City Hospital and reported "some depression" but no other mental health history. Her psychological exam was normal. The cardiologist described her as pleasant. On October 24, 2011, plaintiff saw Dr. Boulware and denied anxiety, nervousness, high stress, depression, agitation, irritability, sleep problems and memory loss. She was alert and oriented times four, her mood and affect were appropriate, she had a normal attention span, normal concentration, and she was in no acute distress.

The overwhelming medical evidence by plaintiff's treating primary care physician, her treating psychiatrists, emergency room and other treating physicians at various hospitals over a several-year period all contradict the conclusions reached by Ms. Chance in this Mental Residual Functional Capacity Assessment.

Based on the substantial evidence in the record, I find that the ALJ did not err in failing to give more weight to this opinion.

## VIII.  RESIDUAL FUNCTIONAL CAPACITY

Plaintiff makes several arguments with respect to the ALJ's determination of plaintiff's residual functional capacity.

Plaintiff testified during the second administrative hearing that she worked for years after she had the procedure to place an internal intestinal reservoir.  Therefore, her own testimony establishes that this need to empty her reservoir does not interfere with substantial gainful activity.

Plaintiff argues that the ALJ erroneously placed restrictions on plaintiff's activities with her right arm but not her left when plaintiff suffers from bursitis in her left shoulder.  However, plaintiff testified at the hearing that she can lift a 12-pack of soda with her left arm but not with her right.

Plaintiff argues that the ALJ erred in failing to account for plaintiff's obesity in the residual functional capacity assessment.  The ALJ stated in his order that he had "considered the claimant's obesity under the standard set forth in Social [Security] ruling 02-1p.  The claimant's obesity imposes limitations that would restrict her from performing work at a greater exertional level." (Tr. at 981).  Additionally, I note that during the relevant time period, plaintiff actually lost over 100 pounds and therefore it is questionable whether plaintiff was actually "obese" during much of this time.

I have considered the evidence of record and find that it supports the ALJ's residual functional capacity assessment.

### IX. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff was not disabled from August 15, 2008, through November 5, 2011. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 22, 2014